# THE STATE v. ORRICK, *Appellant.*

## DIVISION TWO.

1. **Constitution**: STATUTE: LOCAL OR SPECIAL ACT: NOTICE. The act of the legislature, approved April 5, 1887 (Laws, 1887, p. 153), relating to the holding of courts in the twenty-third judicial circuit and providing for the holding of court in Wayne county at a place other than the county seat, is not a special or local act, and, therefore, no notice of the proposed enactment of said law was required.

2. ———: ———: TITLE CONTAINING BUT ONE SUBJECT. Nor is said act repugnant to the constitutional clause providing that no bill shall contain more than one subject, which shall be clearly expressed in its title. (Const., art. 4, sec. 80.)

3. **R. S. 1889, Going into Effect of**: ACTS CHANGING TIME OF HOLDING COURTS. The act of the legislature of May 30, 1889, detaching Wayne county from the twenty-third judicial circuit and annexing it to the twenty-sixth circuit, and changing the time of holding the court at Piedmont in said county, went into effect under the act of 1889, Laws, p. 149 (R. S. 1889, sec. 6614), ninety days after the adjournment of the legislative session of 1889.

4. **Criminal Practice**: INDICTMENT: GRAND JURY, FOREMAN OF. Where the record in a criminal cause shows that Monroe Gill was one of the grand jurors, and that he was the only one of the name of Gill on such jury, and the indictment was indorsed "a true bill, Wm. M. Gill, Foreman of Grand Jury," it will be presumed, until the contrary is shown, that the indorsement was that of the foreman appointed by the court.

5. **Certiorari**: ISSUANCE OF WRIT. A writ of *certiorari* to correct a record does not issue as a matter of right; the application must be supported by evidence showing that the record is defective.

6. **Practice, Criminal**: ASSISTANT PROSECUTING ATTORNEY. It is not error for the trial court to permit an attorney to assist the prosecuting attorney in the trial of a criminal case.

7. ———: PRINCIPALS AND ACCESSORIES: STATUTE. The distinctions between principals in the first and second degrees and accessories before the fact in felonies have been abolished in this state, and all principals in the second degree and accessories before the fact may be indicted, tried, convicted and punished as principals in the first degree. (R. S. 1879, sec. 1649.)

| | |
|---|---|
| 106 | 111 |
| 106 | 134 |
| 106 | 111 |
| 110 | 222 |
| 111 | 584 |
| 106 | 111 |
| 113 | 503 |
| 116 | 12 |
| 117 | 342 |
| 106 | 111 |
| 118 | 110 |
| 118 | 121 |
| 118 | 142 |
| 119 | 421 |
| 119 | 611 |
| 106 | 111 |
| 121 | 152 |
| 123 | 400 |
| 124 | 487 |
| 106 | 111 |
| 126 | 426 |
| 126 | 618 |
| 106 | 111 |
| 136 | 427 |
| 137 | 271 |
| 106 | 111 |
| 146 | 300 |
| 106 | 111 |
| 84a | 19 |
| 106 | 111 |
| 164 | 551 |
| 106 | 111 |
| 187 | 267 |
| 106 | 111 |
| 172 | 11340 |
| 172 | 12342 |

8. **Criminal Law**: PARTICIPATION IN CRIME. Mere consent to a crime, when no aid is given and no encouragement rendered, does not constitute participation therein.

9. —— : —— : MURDER. On a trial for murder it appeared that defendant was present when the deceased was shot, and that, before the shooting, it appeared that he and his brother had made threats against the life of the deceased, and that, after a warrant was issued for defendant's arrest, he, with his brother, concealed himself, and, when arrested, escaped by giving himself an assumed name; that he was again arrested, but escaped from jail and while at large admitted that he knew who did the killing. *Held*, that the evidence was sufficient to warrant the jury in finding that defendant's brother committed the homicide, and that defendant was present giving him aid and comfort.

10. —— : SUFFICIENCY OF EVIDENCE TO SUPPORT CONVICTION. Where, in a criminal cause, the inference of guilt can be reasonably drawn from the evidence, the supreme court will not interfere with the verdict on the ground of insufficiency of the evidence to support it.

11. —— : SEPARATION OF JURY : STATUTE. Under sections 1910 and 1966, Revised Statutes, 1879, a new trial is mandatory in felony cases because of the separation of the jury, only where such separation occurred *after* the retirement of the jury to consider their verdict.

12. —— : —— : ——. Where such separation occurs in violation of Revised Statutes, 1879, section 1609, during the progress of, the trial and before retirement for the consideration of the verdict, it will constitute a ground for a new trial, unless it is made affirmatively to appear on the part of the state that the jurors were not subject to improper influence.

ON MOTION TO TRANSFER TO COURT IN BANC.

13. **Supreme Court Practice**: TRANSFER OF CASE TO COURT IN BANC : CONSTITUTIONAL AMENDMENT OF 1890. A cause will, on motion of the losing party, be transferred to the court *in banc*, under the constitutional amendment of 1890, only "where a judge of the division dissents from the opinion therein, or where a federal question is involved."

14. —— : —— : ——. The fact that one of the judges of the division does not sit in the hearing of a cause does not confer on the losing party the right to have it transferred to the court *in banc*.

*Appeal from Iron Circuit Court.*—HON. J. L. THOMAS, Judge.

AFFIRMED.

*J. B. Walker* and *W. S. Anthony* for appellant.

(1) The act of the legislature ( Acts, 1887, p. 153) creating the Piedmont branch of the Wayne circuit court is void because in conflict with article 4, section 54, of the constitution of Missouri. *First.* The act comes within the rule that " no local or special law shall be passed unless notice of the intention to apply therefor shall be published in the locality where the matter or thing to be affected may be situated, * * * and the notice shall be recited in the act according to its tenor," in that there was no. notice. Const., art. 4, sec. 54. *Second.* The act is local and special, comes within the constitutional inhibition, for that it pertains to "regulating the affairs of counties, * * * prescribing the powers and duties of officers of counties, * * * and * * * regulating the practice and jurisdiction" of the Wayne county circuit court. Const., art. 4, sec. 53; *State ex rel. v. Hermann,* 75 Mo. 340; *Ewing v. Hoblitzell,* 85 Mo. 64; *State ex rel. v. County Court,* 89 Mo. 237. (2) The part of the act of 1889 ( Acts, p. 67, sec. 52), attaching Wayne county to twenty-sixth judicial circuit did not go into effect until November 1, 1889. (3) The court erred in receiving oral evidence that Wm. M. Gill, who signed the indictment as foreman, was the same person as Monroe Gill, appointed by the court, foreman of the grand jury. What a court does is known by its record; its doings and proceedings cannot be established by parol testimony; the record of a court imports absolute verity. *Midlin v. Platte Co.,* 8 Mo. 235 ; *Milan v. Pemberton,* 12 Mo. 598; *Dennison v. St. Louis Co.,* 33 Mo. 168; *Maupin v. Franklin Co.,* 67 Mo. 327. (4) Upon defendant's motion suggesting the diminution of the record in that the copy of the indictment in the transcript was certified as signed " M. M. Sheets," defendant alleging that the original was signed "N. M.

Sheets," the court should have made an order directing the proper clerk to send a correct transcript. *Laporte v. State*, 6 Mo. 208 ; *State v. Haws*, 98 Mo. 188; *Henderson v. Henderson*, 55 Mo. 534. ( 6 ) The court should not have admitted counsel hired by friends of the deceased to assist in the prosecution. ( 7 ) Testimony showing that prior to the homicide the father of deceased was shot, and that defendant was suspected of it, should have been excluded. It did not tend to prove this homicide, yet it prejudiced the jury, and might have caused them to take less evidence to convict. *State v. Turner*, 76 Mo. 350 ; *State v. Reavis*, 71 Mo. 419 ; *State v. Reed*, 85 Mo. 194. ( 8 ) The evidence of witnesses Gibson and Chance that they communicated to defendant the threats of deceased, and his charge that defendant had shot his father, was not competent and not of the *res gestœ*. *State v. Umfried*, 76 Mo. 404. ( 9 ) The court should have granted a new trial on account of the separation of the jury. *First.* In the light of the state's own testimony ( see testimony of juror Jones and second testimony of the sheriff ) there was a separation, and the juror was neither in the custody of an officer nor "securely locked up." *Second.* Nor was there such an "imperious necessity" for that separation as to justify it. If the juror was able to come down stairs when he got ready, he was able to when the others did. And, whether he was able to get up and go with the others when they took the walk or not, the sheriff should, having left him, have so left him in the custody of an officer or securely locked up. *State v. Murray*, 91 Mo. 95 ; *State v. Collins*, 81 Mo. 652 ; R. S. 1879, secs. 1910, 1966. ( 10 ) The court should not have instructed the jury that they might find defendant guilty if he was an aider and abettor, in the absence of evidence, either direct or by implication, of a conspiracy to murder, and connection therewith of defendant. Greenl. Ev. [ 12 Ed. ] sec. 111; *State v. Walker* 98 Mo. 95. Instructions, must be predicated

upon the evidence. *Budd v. Hoffmeister*, 52 Mo. 297; *Givens v. Van Studdiford*, 4 Mo. App. 499; *Raysdon v. Trumbo*, 52 Mo. 35; *White v. Chaney*, 20 Mo. App. 389. It is error to instruct a jury upon an hypothesis not warranted by the evidence. *Bank v. Overall*, 16 Mo. App. 116; *Skyles v. Bollman*, 85 Mo. 35. (11) There was not sufficient evidence upon which to base a verdict; and the verdict was, in view of the fact that the evidence was entirely circumstantial, and by no means "inconsistent with every reasonable hypothesis save that of guilt," clearly the result of passion, prejudice and partiality. *State v. Glahn*, 97 Mo. 679; *State v. Thomas*, 78 Mo. 342; *State v. Zorn*, 71 Mo. 415; *State v. Musick*, 71 Mo. 410; *State v. Cook*, 58 Mo. 548. Mere proof of the homicide and that defendant had made threats against deceased will not support a conviction of murder of the first degree. *State v. Glahn*, 97 Mo. 679.

*John M. Wood*, Attorney General, for the State.

(1) The act of 1887 providing for holding of circuit courts at Piedmont was not unconstitutional. It is neither a special nor a local law. 3 Am. & Eng. Ency. of Law, 697; *State v. Miller*, 100 Mo. 447; *State v. Walton*, 69 Mo. 556; *State v. Daniels*, 66 Mo. 192; *State v. County Court*, 50 Mo. 317. (2) The act of 1889 attaching Wayne county to the twenty-sixth judicial circuit took effect within ninety days after the adjournment of the legislature. R. S. 1889, sec. 16, p. 149. (3) Where the foreman's whole name is in the record, a signature by initials for his christian name is sufficient. 1 Bish. Crim. Proc., sec. 698; *State v. Taggart*, 38 Me. 298; *Studhill v. State*, 7 Ga. 2; *Com. v. Gleason*, 110 Mass. 66; *State v. Tinney*, 26 La. Ann. 460; *State v. Powell*, 24 Tex. 135. (4) It appears that the juror Jones was sick and unable to go out with the other members of the

jury, and that the sheriff left him locked in a room to himself. It is only where it appears that the jurors have been tampered with, that this court will reverse on account of a separation. *State v. Bell*, 70 Mo. 633. The separation was unavoidable, and in no sense prejudicial, and was not such as to have entitled the defendant to a new trial. *State v. Washburn*, 91 Mo. 571. (5) The evidence fully justified the jury in finding the defendant guilty as charged, and this court will not in any case interfere on the ground that the verdict is against the evidence, unless it appears that the jury acted from prejudice or passion. *State v. Lane*, 93 Mo. 547; *State v. Cook*, 58 Mo. 548; *State v. Musick*, 71 Mo. 401, *State v. Warner*, 74 Mo. 38; *State v. Hammond*, 77 Mo. 169.

MACFARLANE, J.—Defendant was indicted in the circuit court of Wayne county, at the November adjourned term of said court held at Piedmont in February, 1889, for the murder of Hiram Antis. A change of venue was afterwards granted to Iron county circuit court, in which defendant was tried and convicted of murder in the first degree, from which he has appealed.

I. It is insisted, in the first place, that the act of 1887, page 153, which provides for holding terms of the circuit court at Piedmont, is a local or special act, and the notice, required in such cases, not having been given, is unconstitutional and void, and the indictment found by the grand jury in the court held by authority thereof was a nullity. The important question here raised has been, at this term, settled by the decision of division 1, in the case of the *State ex rel. Hughlett v. Hughes*, 104 Mo. 459. In that case the act of 1889, page 68, establishing terms of the circuit court of Montgomery county, at Montgomery City, was questioned also, as being in conflict with various provisions of the state constitution. It was held that the act in question did not embrace more than one subject, whose title was

clearly expressed in the words, "An act providing for the times and places of holding courts in Montgomery county," and that said act was not a local or special law. This decision fully settles the objection to the constitutionality of the act in question.

II. Under an act approved May 30, 1889 (Acts 1889, p. 67), Wayne county was detached from the twenty-third and attached to the twenty-sixth judicial circuit of the state, and the time for holding court, at Piedmont, changed to the fourth Monday in September. On the twenty-sixth day of September, 1889, a term of court was held at Piedmont by the judge of the twenty-sixth circuit. At this term defendant was arraigned, and called upon to plead. This he refused to do for the reason, as given, that the act attaching Wayne county to the twenty-sixth judicial circuit did not take effect until the first day of November, 1889. The court ordered the clerk to enter a plea of not guilty.

Section 16 of the act declaratory of the Revised Statutes (Acts, 1889, p. 149) provides that, "The Revised Statutes, as declared by this act, shall take effect and go into operation from and after the first day of November, 1889, except such acts passed by the present general assembly, and incorporated therein, as shall by their provisions take effect at a different time; acts changing the time of holding courts shall take effect in ninety days after the adjournment of this session of the legislature; and until the Revised Statutes shall go into effect, as herein provided, the existing statutes shall continue in force." The act in question changes the territorial boundaries of the twenty-third and twenty-sixth circuits, and changes the times of holding courts therein. Both purposes are accomplished by the single act. This act did change the time of holding the courts in these circuits, and the whole act, and not a part only, went into effect under section 16, *supra*, "in ninety days after the adjournment of

the legislature,"which was prior to holding the term of court at which defendant was arraigned.

III.   The record shows that Monroe Gill was one of the panel of grand jurors by which the indictment was found.   No other Gill was on the jury.   The indictment was indorsed, "a true bill, Wm. M. Gill, foreman of the grand jury."   An objection was made to the indictment by motion to quash, on account of not being indorsed by one as foreman whose name appeared as a member of the jury.   The state offered witnesses who testified that Monroe Gill and Wm. M. Gill was the same person, and that he always signed his name Wm. M. Gill.   Objection was made to this testimony on the ground that it was an attempt to contradict the record by parol evidence.

The foreman of a grand jury is required to certify under his hand, that the indictment is a true bill by the following indorsement, thus: "A true bill, A. B. Foreman." R. S., sec. 4090.   All that is required, by this statute, is the usual signature of the foreman to the certificate.   1 Bish. Crim. Proc., sec. 698; *State v. Taggart*, 38 Maine, 298; *Studstill v. State*, 7 Ga. 2; *Commonwealth v. Gleason*, 110 Mass. 66; *State v. Burgess*, 24 Mo. 381.   The court appoints the foreman, indictments are returned into open court by the foreman, in the presence of the whole jury.   It would seem impossible that the court could be imposed upon.   The presumption that the indorsement upon the indictment was that of the foreman, appointed by the court, would be so strong that one objecting should show the contrary.   The evidence coming from the state was unnecessary, and did no injury to defendant.

IV.   The indictment was signed by M. M. Sheets as prosecuting attorney, as appeared from the transcript of the records of Wayne county.   Defendant insisted that the original was signed N. M. Sheets.   He asked for writ of *certiorari* for the purpose of getting a corrected record.   The court upon inspection of the original

indictment was of the opinion that it was signed M. M. Sheets. The writ was refused. No showing was made by defendant by affidavit, or by other evidence, that the transcript was incorrect. The writ does not issue as a matter of right, on mere suggestion of defects; the application should have been supported by evidence that the record was defective.

V. There was no error in permitting an attorney other than the prosecuting attorney of the county to assist in the prosecution. *State v. Taylor*, 98 Mo. 243; *State v. Robb*, 90 Mo. 30.

VI. · The court gave the jury the following instruction: "If you find from the evidence in the cause that some one else beside defendant wilfully, deliberately, premeditatedly, and of his malice aforethought, shot with a shotgun, and, by shooting, killed said Hiram Antis, *alias* John Martin, and that defendant was then and there present, wilfully, deliberately, premeditatedly, and of his malice aforethought, aiding and abetting such other person in so shooting and killing said Antis, *alias* Martin, then defendant wilfully, deliberately, premeditatedly, and of his malice aforethought, shot and killed said Antis, *alias* Martin, within the meaning of the foregoing instruction, and is as guilty under this indictment as if he had fired the gun himself." The indictment, in the usual form, charged defendant alone, as principal, with murder in the first degree. No one was charged as being accessory to the crime. Two objections are made to the foregoing instruction: *First*, that, under the indictment, defendant could not be found guilty as accessory before the fact. *Second*, that there was no evidence that defendant was present aiding and abetting the one who perpetrated the crime.

There is no force in the first objection. All distinction between principals, principals in the second degree and accessories before the fact have been abolished by section 1649, Revised Statutes of 1879. All

are made principals, and may be indicted, tried, convicted and punished as such. *State v. Fredericks*, 85 Mo. 150; *State v. Anderson*, 89 Mo. 333; 2 Bish. Crim. Proc., sec. 3; 1 Whar. Crim. Law, secs. 221, 228; *State v. Rucker*, 93 Mo. 89.

The acts and conduct necessary to constitute one a principal in the second degree are formulated by Wharton in his work on criminal law (volume 1, sec. 211*a*) as follows: "Something must be shown in the conduct of the bystander, which indicates a design to encourage, incite, or in some manner afford aid or consent to, the particular act; though when the bystander is a friend of the perpetrator, and knows that his presence will be regarded by the perpetrator as an encouragement and protection, presence alone may be regarded as an encouragement. 'Where presence may be entirely accidental, it is not even evidence of aiding and abetting. Where presence is *prima facie* not accidental, it is evidence; but no more than evidence, for the jury.' It is not necessary, therefore, to prove that the party actually aided in the commission of the offense; if he watched for his companions in order to prevent surprise, or remained at a convenient distance in order to favor their escape, if necessary, or was in such a situation as to be able readily to come to their assistance, the knowledge of which was calculated to give additional confidence to his companions, in contemplation of law he was aiding and abetting." "Mere consent to a crime, when no aid is given, and no encouragement rendered, does not amount to participation." 1 Whart. Crim. Law, sec. 211 *d; White v. People*, 81 Ill. 333; *Tullis v. State*, 41 Tex. 598; *State v. Walker*, 98 Mo. 95.

In order then to justify this instruction, the evidence must have tended to prove, that defendant was present when the crime was committed; that he understood the homicide would be attempted; and that he did some act in aid of his principal in the commission of the felony, or his presence gave encouragement to its perpetration.

A consideration of the evidence, on this question, somewhat in detail, becomes necessary. Deceased and his father and their respective wives lived in the town of Gads Hill in Wayne county. The house in which they lived was a two-story house. It. was s'tuated about one hundred feet east, of the small depot of the Iron Mountain railroad. To the east of the house fifteen or twenty feet was a vegetable cellar, the roof of which was about five feet high. A horse lot fenced with slats joined up to this cellar; some underbrush was in the lot, and a stable about fifty yards from the house. The ground sloped downward from the stable to the depot at about thirty degrees. Some two weeks prior to the homicide the father of deceased had been shot and wounded by some unknown person. Defendant had spent one or two nights at the house waiting on the wounded man. On the night of the murder defendant came to the house, and again offered his services. They were not needed. He left about half past eight. As he was leaving he asked deceased if he was going down the street. Deceased and defendant went down stairs together. In a minute after they got down a gun was fired, and deceased was killed. Immediately on the firing of the gun, defendant called to the wife of the deceased, "Run here quick, John is shot." She went down immediately and found her husband as he testified lying on the porch, and defendant standing by him. She asked, "Who in the world done this?" He answered, "I don't know, I never seed anything but the blaze from the gun." The evidence showed, from the wound on the person of deceased, and from marks on the ice and snow with which the ground was covered, that deceased walked out to the cellar and when shot was standing with his back towards the southwest, about in the direction of the southeast corner of the house. The wound was from a shotgun, entering the body at the right nipple, fifteen or twenty shots passing through the heart. The blood spirted out toward the east. "He

was standing right at the southeast corner of the cellar, urinating, a little north of the corner; he was standing two feet from the corner * * * judging from the wound I should say the shot was fired at a distance of not more than fifty nor less than fifteen or twenty feet. The angle downward, the wound penetrated, was about the slant of the ground." (Testimony of Dr. Holmes.)

Immediately on hearing the shot, the agent of the depot went out of the door, went to the north and then to the south end of the depot, and saw defendant about half way from the depot to the house. He seemed to hesitate a moment as though undecided, and then called to him to come and they went together to the house. The wife of deceased was already there. This was the agent's testimony, which conflicts somewhat with that of the wife. Defendant was seen with no gun, and none was found on the premises. Defendant remained at the house during the night rendering necessary assistance, and continued there until after the funeral, but being absent on the next day when the inquest was held. Nothing suspicious in his conduct was shown during this time except in absenting himself during the inquest. Nothing, so far, indicates sufficiently that he had any knowledge that a crime was to be committed that night.

The evidence tended further to prove that defendant and his brother Lewis, within a few days previous to the homicide, had made threats against deceased. On this subject the railroad agent, Gibson, testified: "A night or two before the killing, Orrick and his brother Lewis were in my office two or three hours; we talked about everything; Henry Orrick asked me if Martin ( deceased ) had made any threats against him. I told him he did make threats, and he wanted to know what they were, and I told him that Martin told me that it would not be very good for him to catch him that night or any night, it made no difference where it was * * * because he said he was as good a man and a

good shot ; and Henry and Lewis made the same threats against him, and Henry says, 'Well, it won't be good for him if I meet him, I will just show him what I can do, too.' "

"Q. Did you tell him anything about Martin telling who shot old man Antis ?   A.   I told Orrick that Martin said he knew the tracks were Orrick's, told him that Martin told me he could figure by the tracks the man who did it ; had his eye on him.

" Q.   Did you say anything to Henry about the noise of the crack of the pistol or the gun, that night old man Antis was shot ?   A.   I told Orrick, Martin said he knew the sound of the pistol, and it was Orrick's.

" Q.   Do you remember anything about Orrick's replying that he'd give him some of the same kind of medicine—Martin—or put him where he wouldn't talk about people ?   A.   Well, he just told me that he had been there just a little longer than Martin had, and he better look out or probably he would get the same the old man got—the old man Antis ; and what the old man Antis got is just about what Martin got, that is just about the size of it."

Daniel Chance testified substantially the same as Gibson.   Chance also testified :

"Q.   Do you remember of his telling you of having met Martin somewhere ?   A.   Yes, sir.   He said he met Jno. Martin [ deceased ] in the road on the other side of the blacksmith shop there, and he said if it had not been for Slavin's little boy with him, he'd dropped him in the road at that time.   This was before Martin was killed.   After the killing Orrick told me he was at Martin's house at the time of the killing."

Soon after the murder a warrant was issued for the arrest of defendant.   He, his brother Lewis and the wife of old man Antis were then together in conceal-ment in the woods.   He was arrested by the sheriff, but escaped by giving an assumed name.   He, his brother

and Mrs. Antis went away together. He was arrested in St. Louis in June after the murder, which was in January. Some time after his arrest he escaped from jail; while at large witness Chance testified, defendant told him he knew who killed deceased, but would suffer his throat cut before he would tell.

Throwing the light of all the facts and circumstances, preceding the killing, upon the homicidal act and defendant's presence and conduct on the occasion, and taking in connection his flight in company with his brother and Mrs. Antis, his threats and admissions thereafter, we cannot say that the evidence was insufficient to justify the jury in finding that defendant's brother did the criminal act, and that defendant was present, giving him aid and encouragement. The jurors are the judges of the facts, and their probative force. If an inference of guilt can reasonably be drawn from the evidence there should be no interference by this court, in criminal as well as in civil cases. *State v. Lowe*, 93 Mo. 569; *State v. Cook*, 58 Mo. 548; *State v. Musick*, 71 Mo. 401.

VII. During the progress of the trial and before the case was finally submitted to the jury, the sheriff permitted the jury to separate in the following manner: Sunday morning one of the jurors was not well and remained in the room in the sheriff's residence, while the rest went to breakfast. After eating the sheriff took them to their room in the courthouse. He returned for the absent juror the door of whose room had, during the time, been locked. The juror was not yet up, and the sheriff again left him not locking the door. The juror afterwards went down to the family room of the sheriff, and asked his wife where the sheriff and the rest of the jury were. She told him the sheriff would be there for him soon, asked him in and gave him a paper to read. In about ten minutes the sheriff came for him; no one was shown to have been seen by

the juror except the sheriff's wife, and no further conversation than as above stated was shown.

The rule was followed in this state for many years that the separation of a jury, in a criminal case, was not sufficient to authorize a reversal of a judgment, unless it appeared that improper influence had been exerted, or there was just ground for suspecting such influence. The history of the administration of the criminal law under this rule demonstrates that during the time it was followed, granting new trials was of common occurrence upon this ground, and a conviction was seldom obtained that was not attacked on the ground that the jury had been permitted to separate, and, during such separation, improper influences had been exerted over them. *Whitney v. State*, 8 Mo. 165; *State v. Mix*, 15 Mo. 153; *State v. Barton*, 19 Mo. 227; *State v. Igo*, 21 Mo. 459; *State v. Carlisle*, 57 Mo. 102; *State v. Brannon*, 45 Mo. 330; *State v. Matrassey*, 47 Mo. 295; *State v. Bell*, 70 Mo. 633. Under the revision of 1879 three new sections on this subject were adopted, sections 1909, 1910 and 1966.

These new sections were evidently designed to effect some change in the conduct of criminal trials. Section 1909 so far as it affects the trial of capital cases was but declaratory of the common law, which forbade the separation of the jury during the trial in all felony cases. 1 Bish. Crim. Proc., sec. 995. In so far as said section authorized the separation of the jury in felony cases other than those made capital by the statute, it effected a relaxation of the common-law rule to the extent of permitting a separation of the jury by consent of the parties. If this section stood alone no such change in the statute could be seen as would require any change of the practice in respect to the separation of the jury, or the rule, above mentioned, requiring suspicion of improper influences upon the jury before a verdict would be set aside on account of a separation.

It is not so, however, in regard to sections 1910 and 1966. These were evidently intended to effect a radical change in the previous law and practice; yet it will be observed that these sections, by their express terms, only apply to the conduct of juries after they retire, under the charge of a sworn officer, to deliberate upon their verdict. From that time until their final discharge the law is imperative that they shall be kept separated. A failure to observe the requirements of section 1910 will be cause for a new trial under section 1966. These sections have been construed, by this court, in a number of cases. They are held to be mandatory to the extent, at least, of preventing any opportunity for misconduct on the part of jurors, or suspicion of improper influences upon them. *State v. Collins*, 81 Mo. 652; *State v. Murray*, 91 Mo. 95; *State v. Woodward*, 95 Mo. 129; *State v. Rush*, 95 Mo. 204; *State v. Washburn*, 91 Mo. 571; *State v. Gray*, 100 Mo. 524; *State v. Witten*, 100 Mo. 527. If, after the case has been finally submitted, and before verdict, it be shown that opportunity was given for improper influences to be used on any juror, that alone would require a new trial, under the construction put upon section 1966 by the court, in the cases last cited. The intention of the legislature in adopting sections 1910 and 1966, as construed, was to require a new trial whenever there was such a separation of the jury as gave opportunity for outside influences, and to cut off inquiry as to whether such influences were, in fact, brought to bear upon it.

The facts in some of the foregoing cases indicate that this last rule was applied to separations occurring during the progress of the trial. The fact that section 1966 only applies to separations after the jury retire to deliberate upon their verdict was not adverted to, and, we presume, was overlooked. Certainly, the statute could not be held mandatory as to a duty not mentioned therein or implied from its terms.

The misconduct charged in this case occurred during the trial and before the jury retired to deliberate, and neither section 1910 or 1966 applies. As has been said, section 1909, as applicable to capital cases, is merely declaratory of the common law, and the effect of a separation upon the verdict before final submission of the case to the jury must be determined by some reasonable rule. There have been two rules applied in such cases, differing only in the measure or degree of proof required to overthrow the verdict. These rules are stated by Thompson and Merriam, in their work on juries, section 328, as follows: "To the rule already stated, that the mere fact of a separation is not, of itself, ground for a new trial, there is an opposing rule, generally applied in capital cases. According to the former rule, a separation of the jury is no ground for a new trial, unless it be made affirmatively to appear probable that the jury were thereby subjected to improper influence. But, according to the present rule, a separation will be ground for a new trial, unless it affirmatively appear that they were not thereby subjected to any improper influence. In other words, under the former rule, a juror may separate from his fellows and from the officer in charge of him, and still the presumption of right acting attends him, just as it attends a judge when he quits his courtroom and mingles with his fellow-citizens. But, under this rule, his departure from the custody and control of the officer is, *prima facie*, sufficient to vitiate the verdict. Under the former rule, a separation shown will not, in the absence of other circumstances of suspicion, entitle the prisoner to a new trial. But, under the present rule, the verdict will be set aside, unless the prosecution remove the presumption which has arisen against its purity, by showing that, as matter of fact, the absent juror was not tampered with, or, at least, by producing evidence which dispels all probabilities or suspicion of tampering." See authorities cited.

The first of these rules was followed by this court in the cases first above cited. But, inasmuch as the rule forbidding the separation of jurors, in capital cases, has been declared by statute; and, in view, too, of the other changes effected by the other sections referred to, we feel satisfied that the more stringent rule should be applied, in case the requirements of section 1909 are disregarded, and that a separation before the jury retires to deliberate upon their verdict will be ground for a new trial, unless it be shown affirmatively by the state that the jurors were not subjected to improper influence. In this case, if it had been shown simply that the juror, of whose conduct complaint is made, separated, and had communication with persons not on the jury, a *prima facie* case for a new trial would have been shown; but the state took the burden of removing the presumption of misconduct by showing that the jury was not in fact subjected to improper influences. The circuit judge was satisfied from the testimony of the juror himself, and of the sheriff, that defendant was in no manner prejudiced by the separation, and we think the evidence justified the conclusion reached.

A number of other minor questions were raised by the record and earnestly urged by counsel as constituting grounds for reversal. We have carefully examined them all and are able to find no error affecting the substantial rights of defendant. Judgment affirmed.

ON MOTION TO TRANSFER TO COURT IN BANC.

MACFARLANE, J.—A motion to transfer this cause to the court *in banc* was made after the decision, under the mistaken belief that one of the judges did not sit at the hearing or participate in the decision. In the case of *State v. Armstrong*, one of the judges did not sit, and a motion was made to transfer the cause to the court *in banc* for that reason. The court in that case held, though no opinion was written, that the right of the

losing party to have a transfer of the case was limited to the causes specified in section 4 of the amendment to the constitution, " where a judge of the division dissents from the opinion therein, or when a federal question is involved." No cause would have been shown in this case for a transfer to *banc*, though one of the judges had taken no part in the decision. All concur.