# THE STATE v. SCHAEFFER, Appellant.

## Division Two, February 24, 1903.

1. **Criminal Law: SECOND DEGREE MURDER: CASE STATED.** The evidence showed that defendant's two sons. and another man, while at a railroad depot, became engaged in a controversy with some other negroes present; that defendant, being informed that negroes at the depot were whipping his sons, went after them and started home with them, but that they were cut off from their home, and assaulted by the crowd of negroes, and were forced to take refuge in a saloon, where defendant procured a gun. Some one of the crowd of negroes threw a rock at defendant while he was in the saloon, and struck him on the shoulder. Shortly afterwards, defendant, with his sons, started for the country to stay over night, but they had gone but a few steps when they again encountered the same crowd of negroes, among whom was the deceased, some of them being armed. One of them remarked, "Here comes Schaeffer with his gun, we better move." The deceased stepped behind a post, and when defendant and his sons came up defendant said, "Where is the black ——— who had it in for me?" and drew up his gun and shot deceased. Deceased was making no demonstration at the time he was shot. *Held*, that the evidence fully justified an instruction on murder in the second degree.

2. ———: **SEPARATION OF JURY: NEW TRIAL: PRESUMPTION: AFFIDAVITS.** A separation. of the jury before retiring to deliberate upon their verdict is ground for a new trial unless it is affirmatively shown by the State that the jurors were not subjected to improper influence. And the affidavits of the sheriff and his deputy and of each of the jurors are sufficient to overcome the presumption that the jury was tampered with.

3. ———: ———: **PERMITTING JURORS TO MINGLE WITH OTHER PERSONS.** The acts of officers in charge of a jury in permitting them to occupy separate rooms with no doors between them, and to mingle with other persons during the trial, is not to be commended, and should not be permitted if possible to prevent it.

4. ———: **MANSLAUGHTER: INSTRUCTION: "VIOLENT PASSION."** A failure to define the term "violent passion," used in an instruction on manslaughter in the fourth degree, is not error where defendant was not convicted of such grade of homicide.

5. ———: **CONSPIRACY: HEARSAY EVIDENCE.** Evidence as to what a supposed conspirator said, which is offered on the theory that a conspiracy exists, when it is apparent that the purpose of the conspiracy has been abandoned, is mere hearsay, and is properly excluded.

Appeal from St. Charles Circuit Court.—*Hon. E. M. Hughes,* Judge.

AFFIRMED.

*Norton, Avery & Young* and *T. F. McDearmon* for appellant.

(1) The court erred in not granting a new trial because of the separation of the jury. R. S. 1899, sec. 2628; State v. McClain, 8 Mo. 153; State v. Murray, 91 Mo. 95; State v. Collins, 81 Mo. 652; State v. Hayes, 81 Mo. 585; State v. Schintz, 137 Mo. 266; State v. Gray, 100 Mo. 523. (2) The court erred in giving an instruction for murder in the second degree. State v. Tomasitz, 144 Mo. 86; State v. Cochran, 147 Mo. 504; State v. Garrison, 147 Mo. 548; State v. Bronstein, 147 Mo. 520; State v. Wingo, 66 Mo. 181. (3) The court erred in not defining the term "violent passion," as used in the instruction on manslaughter in the fourth degree. State v. Andrew, 76 Mo. 101; State v. McKinsey, 102 Mo. 621; State v. Strong, 153 Mo. 548. (4) The court erred in rejecting the testimony of the witness who had the conversation with Julius Washington on the morning after the killing, in which Julius Washington said that guns were in the crowd of negroes, and that Henderson was present and making threats against Schaeffer. State v. Melrose, 98 Mo. 594; State v. Walker, 98 Mo. 95.

*Edward C. Crow,* Attorney-General, and *Jerry M. Jeffries* for the State.

(1) The State, by the evidence, on the motion for a new trial, shows that the jurors were not tampered with or influenced in anywise, that they had no communication with anyone outside of their number, that after the case was submitted to the jury they were not permitted to separate in the rooms. The affidavit of the sheriff, and the affidavit of the deputy

sheriff, and the affidavit of each of the jurors show that the defendant was in nowise prejudiced by this alleged separation of the jury, which was, in fact, no separation at all. State v. Smith, 137 Mo. 266; State v. Orrick, 106 Mo. 124; State v. Howell, 117 Mo. 307; State v. Sansone, 116 Mo. 1. The State, by furnishing evidence that the jurors were not subject to improper influence, has removed the rights of defendant for a new trial. (2) If nothing appears but an unlawful act of intentional killing with a deadly weapon, the law presumes it to be murder in the second degree. Defendant's own testimony warranted the instruction on murder in the second degree. State v. McKenzie, 102 Mo. 620; State v. Foster, 61 Mo. 549; State v. Hudson, 59 Mo. 135; State v. Anderson, 98 Mo. 416; State v. Andrews, 76 Mo. 101. (3) As defendant was not convicted of manslaughter in the fourth degree, the error, if any, in defining ''violent passion'' was harmless. State v. Holloway, 161 Mo. 135; State v. Cochran, 147 Mo. 504; State v. Kindred, 148 Mo. 270; State v. Brown, 145 Mo. 68. (4) Defendant undertook to show a conspiracy among a number of negroes against the defendant, but, from the evidence, he failed absolutely, and what little evidence he did have that tended to prove such a state of facts, in nowise connected Bud Henderson, the deceased, with that conspiracy. The evidence was entirely improper, and even though a conspiracy in which the deceased took part was established by the defense, the evidence would still be inadmissible. State v. Melrose, 98 Mo. 597; State v. Walker, 98 Mo. 95; Greenleaf on Evidence (14 Ed.), sec. 111; State v. Ross, 29 Mo. 32; State v. McGraw, 87 Mo. 116; State v. Dunklin, 164 Mo. 262.

BURGESS, J.—Having been convicted of murder in the second degree under an indictment charging him with murder in the first degree and his punishment fixed at ten years' imprisonment in the penitentiary for shooting to death with a shotgun one Bud Hender-

son, defendant, after unavailing motion for new trial and in arrest appeals.

The homicide was committed at O'Fallon in St. Charles county, Missouri, at about eight o'clock on the evening of September 2, 1900. Defendant, two of his sons, and a man by the name of Hollender, when not at work in the country, lived in an old blacksmith shop on the back part of a lot in O'Fallon, the front of which was occupied by one Vetch as a saloon. About six o'clock or 6:30 on the evening of the homicide, defendant's boys and Hollender were at the railroad depot in said town, and while there a controversy occurred between them and some other negroes who were there. Defendant being informed that negroes at the depot were whipping his boys, went there and got the boys and started back with them to the old shop where they lived, but when they got near the shop they found they were cut off and were then assaulted by the same gang of negroes and were forced to take refuge in Vetch's saloon. In the meantime the anti-Schaeffer crowd of negroes seems to have been joined by a white man by the name of John Moriarity. Schaeffer after getting into the saloon, got his shotgun. A few minutes thereafter some one of the crowd of negroes who had asaulted defendant threw a rock at Schaeffer while in the saloon, and struck him on the shoulder. Schaeffer shortly thereafter, with his two sons and Hollender, started to the country to stay over night with a friend but had gone but a few steps when they again encountered the same gang of negroes (among whom was the deceased, Bud Henderson), some of them armed for the evident purpose of again assaulting defendant. When Schaeffer approached the crowd, Sanford Taggart, who was one of them, remarked, "Here comes Schaeffer with his gun, we better move." Bud Henderson and his nephew stepped behind a post, and Taggart stood still behind a tree, and when defendant and his boy came up defendant said, "Where is the black son-of-a-bitch who had it in for me?" and pulled up his gun and shot, the charge taking effect in Hender-

son's left side, producing death immediately.   Hen-
derson was not doing anything when shot.

After the twelve men were selected and sworn to
try the case they were put in charge of Sheriff Dierker,
with injunction by the court that they should be kept to-
gether and not permitted to separate; but during the
whole of the trial, or at every intermission thereof, the
jury was permitted to and in fact did separate, and
when separated none of them was in the presence or
sight of the sheriff.   The record shows that all twelve
of the men were guests of the Galt house, a hotel in
the city of St. Charles, and that they occupied four sep-
arate rooms; that these rooms were in the third story
of the hotel; that there was no connection between
these rooms, but that in said third story there were
twelve rooms, all opening into a common court, and
to reach any one of these rooms it had to be done from
this court; that while the jury occupied four of the
rooms, and the sheriff and his deputy two of the others,
the other six rooms during the whole of the trial were
occupied by guests of the hotel other than the jury and
the sheriffs, and that this court was used in common
by all of the guests, including the jury, and that often
parts of this jury were seen in this court when the
remainder of the jury and the sheriff or his deputy
were not in sight; that the jurors divided into squads of
two and four and had full control of their respective
rooms; could go and come as they pleased; had the
keys to the rooms and could lock themselves in or un-
lock the doors and come out at their own free will; and
that the sheriff and his deputy had separate rooms, not
connected with the rooms of the jurors at all, and as
the sheriff says, "It was possible at any time for the
jurors to leave their rooms or to admit others to their
rooms."

To overcome any presumption that the jury were
tampered with at any time during the trial and that
they were not subjected to improper influences, the
State introduced the affidavits of the sheriff and his
deputy who were in charge of the jury all the time,

and of each one of the jurors, showing that the jurors were not subject to improper influence during the trial, nor is it claimed that they were in fact, but the contention is that the statute, section 2628, Revised Statutes 1899, is mandatory and the separation of the jury in violation thereof. It provides that, "with the consent of the prosecuting attorney and the defendant, the court may permit the jury to separate at any adjournment or recess of the court during the trial in all cases of felony, *except in capital cases.*" And it has been held under this section that a new trial is only mandatory because of the separation of the jury where such separation occurs *after* the retirement of the jury to consider their verdict. [State v. Orrick, 106 Mo. 111.]

There is no pretense that the jury were permitted to, or that they did, separate after the case was finally submitted to them for their determination, so that the only question is with respect to the effect of the separation of the jury while the case was being heard, and before finally submitted to them. Section 1909, Revised Statutes 1879 (sec. 4209, R. S. 1889), is simply declaratory of the common law which forbade the separation of the jury in the trial of all felony cases. [1 Bishop's Criminal Prac., sec. 995.] And unless changed by some other statute, or by adjudication of the Supreme Court, the law remains the same as at common law and the verdict in the case at bar would have to be set aside on account of the separation of the jury. But in the Revised Statutes of 1879, three new sections on this subject were adopted, viz., section 1909, supra, sections 1910, and 1966. And notwithstanding the fact that section 1909 provides that the court may permit the jury to separate by and with the consent of the defendant and the prosecuting attorney at any adjournment or recess of the court during the trial, in all cases of felony, *except in capital cases,* it was held in the case of State v. Orrick, supra, wherein the jury separated before the case was finally submitted to them, that said sections 1910 and

1966 were intended to effect a radical change in the previous law and practice; yet it will be observed that these sections, by their express terms, only apply to the conduct of juries after they retire, under the charge of a sworn officer, to deliberate upon their verdict. From that time until their final discharge, the law is imperative that they shall be kept together. The court said: "As has been said, section 1909, as applicable to capital cases, is merely declaratory of the common law, and the effect of a separation upon the verdict *before final* submission of the case to the jury, must be determined by some reasonable rule. There have been two rules applied in such cases, differing only in the measure or degree of proof required to overthrow the verdict. These rules are stated by Thompson and Merriam, in their work on Juries, section 328, as follows: 'To the rule already stated, that the mere fact of a separation is not, of itself, ground for a new trial, there is an opposing rule, generally applied in capital cases. According to the former rule, a separation of the jury is no ground for a new trial, unless it be made affirmatively to appear probable that the jury were thereby subjected to improper influence. But, according to the present rule, a separation will be ground for a new trial, unless it affirmatively appear that they were not thereby subjected to any improper influence. In other words, under the former rule, a juror may separate from his fellows and from the officer in charge of him, and still the presumption of right acting attends him, just as it attends a judge when he quits his courtroom and mingles with his fellow-citizens. But, under this rule, his departure from the the custody and control of the officer is, prima facie, sufficient to vitiate the verdict. Under the former rule, a separation shown will not, in the absence of other circumstances of suspicion, entitle the prisoner to a new trial. But, under the present rule, the verdict will be set aside, unless the prosecution remove the presumption which has arisen against its purity, by showing that, as matter of fact, the absent juror was not

tampered with, or, at least, by producing evidence which dispels all probabilities or suspicion of tampering.' . . . But, inasmuch as the rule forbidding the separation of jurors in capital cases, has been declared by statute; and, in view, too, of the other changes effected by the other sections referred to, we feel satisfied that the more stringent rule should be applied, in case the requirements of section 1909 are disregarded and that a separation before the jury retires to deliberate upon their verdict will be ground for a new trial, *unless it be shown affirmatively by the State that the jurors were not subjected to improper influence."*

State v. Sansone, 116 Mo. 1, was a prosecution for a capital offense, and after conviction defendant asked for a new trial upon the ground that one of the jurors was permitted to separate from the others during the trial, and upon its being affirmatively shown on the part of the State that the juror was not subjected at any time to any improper influences, it was held, that the presumption arising from the separation was fully rebutted. [Citing State v. Orrick, supra; State v. Avery, 113 Mo. 475, and other cases.]

State v. Howell, 117 Mo. 307, was a prosecution for murder in the first degree, and, after conviction defendant moved for a new trial upon the ground that the jury separated during the trial. SHERWOOD, J., speaking for the court, said: "We have hitherto ruled that section 4209, Revised Statutes 1889, respecting the non-separation of jurors in capital cases, must be strictly observed. [State v. Murray, 91 Mo. 95; State v. Gray, 100 Mo. 523.] In this case, however, the State has assumed the burden under the ruling in State v. Orrick, 106 Mo. 111, and affirmatively shown the facts aforesaid, which facts directly establish that no such separation has occurred, as would fall within the purview of our statute or former rulings (See, also, State v. Sansone, 116 Mo. 1)."

Similar views were expressed and the rule announced in State v. Orrick, supra, were adhered to in

State v. Schmidt, 137 Mo. 266, and, must now be considered as the settled law of this State.

But the acts of the officers in charge of the jury in this case in permitting them to occupy separate rooms with no doors between them and to mingle with other persons during the trial, is certainly not to be commended and should not be permitted if possible to prevent it, which could have been done in this case.

It is said that the court erred in instructing the jury for murder in the second degree. The contention is that there was no evidence to warrant such an instruction, and that, under the evidence, if defendant was guilty of any offense it was either murder in the first degree or manslaughter in the fourth degree. But we are unable to concur in this view. There was no question as to the killing, and as the evidence tended to show that it was done with premeditation, it fully justified the instruction upon that theory of the case.

It is insisted that as the court instructed the jury for manslaughter in the fourth degree, it committed error in not defining the term "violent passion" as therein used. A sufficient answer to this contention is, that as defendant was not convicted of manslaughter it is impossible that he could have been injured by the failure of the court to define the term "violent passion." It has been held by this court that a defendant can not complain of an instruction with respect to a grade of homicide of which he was not convicted, even though the instruction was erroneous. [State v. Dunn, 80 Mo. 681.] And the same rule should be applied to the failure to define a term, or words used in an instruction given in behalf of defendant, when not convicted of a grade of homicide covered by such instruction.

No error was committed in excluding evidence offered by defendant as to what Julius Washington said the next morning after the homicide with respect to the conduct of the negroes the evening before, that one of them at least in the crowd where Henderson was killed was armed. This evidence was offered upon

·the theory that Washington was one of the conspirators and that any statement made by him in regard to the statements and acts of any of the conspirators was admissible in behalf of defendant. But it is clear that the purpose of the conspiracy, if there was one, had been abandoned, and the proffered evidence was mere hearsay. [State v. Walker, 98 Mo. 95.]

Nor do we think the remarks of the prosecuting attorney in his closing address to the jury of such a character as would justify a reversal upon that ground.

Counsel for defendant has presented an able brief and argument in behalf of his client, but after a careful consideration of them we are of the opinion that there is no reversible error in the record, and therefore the judgment should be affirmed. It is so ordered.

All concur.