The State v. Howell.

---

## THE STATE v. HOWELL, *Appellant.*

### Division Two, June 27, 1893.

1. **Practice:** FALSIFICATION OF BILL OF EXCEPTIONS: REMEDY. The supreme court will, in a proper case, direct the trial judge to try the issue of the falsification and change of the evidence contained in the bill of exceptions and to restore it to its true condition and will treat such restored bill as the true one on the hearing of the appeal. (See statement *infra*.)

2. **Criminal Practice:** CONTINUANCE. An application for a continuance of the trial of a criminal case should comply with the statutory requirements therefor. Revised Statutes, 1889, sec. 4181.

3. ———: ———. The fact of the absence of a witness who can be used merely to impeach a witness of the adverse party is no ground for a continuance.

The State v. Howell.

4. ——: ——: PRESUMPTION. Every reasonable presumption is to be indulged in behalf of the action of the trial court in refusing a postponement of the third trial of a criminal case.

5. ——: SEPARATION OF JURY: NEW TRIAL. While the jury, during the trial of a murder case, were on the street in charge of the sheriff, a juror called across the street to a relative to inquire about the health of his mother, and with the sheriff walked partly across the street in view of the other jurors and in a voice sufficiently loud to be heard by the other jurors spoke of the possible death of his mother. *Held*, not to furnish sufficient ground for a new trial.

6. ——: PREJUDICE OF JURORS: NEW TRIAL. The action of the trial court in denying a new trial in a murder case on account of the prejudice of some of the jurors will not be disturbed, when such jurors deny the fact of such prejudice and there are conflicting affidavits as to their reputations for veracity.

7. ——: EVIDENCE: ESCAPE. Evidence is admissible to show that pending an appeal from a conviction on a former trial for the same offense the accused attempted to escape jail.

8. ——: ——: NEW TRIAL. A new trial will not be awarded merely to enable a defendant to impeach a witness.

9. ——: ——. The fact that on a prior trial the defendant and the state stipulated that a certain person, if present, would testify as to the existence of a certain state of facts, is not sufficient ground for excluding the evidence of such witness at a subsequent trial, though he testifies to a different state of facts.

10. **Murder in First Degree:** VERDICT: EVIDENCE. The evidence in this case reviewed and *held* to support the verdict of guilty of murder in the first degree.

*Appeal from Grundy Circuit Court.*—HON. C. H. S. GOODMAN, Judge.

AFFIRMED.

THE indictment charges the defendant with the murder of Nettie Hall in Linn county on the nineteenth of January, 1889, and this cause comes to this court for the second time. See 100 Mo. 628, where a reversal of the judgment occurred because of error in some of the instructions.

On the return of this cause, the defendant at the June term, 1890, took a change of venue on account of the prejudice of the inhabitants of the counties of Linn and Chariton. Thereupon the cause was transferred to Grundy county in the same circuit, and at the April term, 1891, of the Grundy circuit court, another trial of the cause occurred, in which the jury failed to agree. At the August term next ensuing, defendant filed an application for a change of venue, urging that the trial judge was prejudiced. This resulted in the Hon. C. H. S. Goodman, then judge of the twenty-eighth circuit being called in to sit in the cause, which he did at the adjourned August term, 1891, and having overruled an application for a continuance made by defendant, the parties announced ready for, and went to, trial on the third day of October, 1891, resulting in a verdict of guilty of murder in the first degree, delivered October 9, 1891, and after judgment and sentence, defendant appealed.

The bill of exceptions in this cause was signed and filed April 20, 1892, and yet the transcript herein was not filed in this court until January 23, 1893, or nearly sixteen months after the trial occurred. Although the record is voluminous, there is no excuse for such an unreasonable delay, and investigation should be made as to the cause of such delay.

On the arrival of the transcript, the cause was set down for argument on the thirteenth day of April, 1893, and argued and submitted on that day. Subsequently, however, on suggestion accompanied by affidavits that the bill of exceptions was false and forged, and had been mutilated and changed since being signed by the Hon. C. H. S. Goodman and filed in the office of the clerk of the circuit court of Grundy county, on motion of the attorney general, set aside on the second day of May, 1893.

On May 15, 1893, the attorney general moved the court for a rule and order on the Hon. C. H. S. Goodman, who had then ceased to be judge, commanding him to examine into the suggestion thus made. On May 17, 1893, this motion was granted, and the following rule and order issued to the Hon. C. H. S. Goodman: "Now, at this day it being suggested to this court by the attorney general, who appears on behalf of the state, that the bill of exceptions in this cause, since the same was signed and sealed by the Hon. C. H. S. Goodman, who tried said cause and prior to the time the same was filed in this court has been tampered with, changed and fraudulently altered in the following points and particulars, to-wit: That the testimony of James Hall, R. N. Vorce, D. C. Orr and Jas. C. Moore, who were sworn on behalf of the state and testified upon said trial, and Joseph A. Howell, the defendant herein, who was sworn upon his own behalf and testified upon said trial, has been so changed and altered in the copies of same in the bill of exceptions on file in this court and in the office of the clerk of the circuit court of Grundy county, Missouri, as to omit much material and important evidence adduced upon said trial and so as to insert in said bill of exceptions statements not made by said witnesses upon said trial. That the transcripts on file as aforesaid in this court and in the office of the clerk of the circuit court of Grundy county, do not contain the testimony as given by said witnesses upon said trial, nor do they contain the true copy of said testimony as written in shorthand during said trial, and transcribed by the official stenographer, nor as signed and approved by said circuit judge, but are each false, forged and untrue as aforesaid, and in other particulars. And, whereas the suggestion thus made by the attorney general is duly supported by affidavits; now, therefore, in order that

it may be determined whether in deed and in truth said bill of exceptions has been thus fraudulently altered and spoliated as aforesaid, it is considered and ordered by this court that a rule go to the Hon. C. H. S. Goodman, judge as aforesaid, commanding him that he do careful examination make of the said bill of exceptions in connection with the transcribed stenographic notes of said trial and evidence and affidavits filed herein and in connection with such other evidence as he may deem it necessary to take, and that from such notes of evidence, affidavits and other testimony, he do determine whether such bill of exceptions has been fraudulently altered as has been suggested; and if he, the said judge, do find in manner as aforesaid that said bill of exceptions has been altered, that he do proceed at once upon the transcribed stenographic notes of evidence taken at the trial of this cause and the affidavits and evidence as aforesaid and on his own knowledge to restore the said bill of exceptions to what it was at the time the same was signed and sealed by him, and forward the same to this court. And it is further considered and ordered by the court that if the Hon. C. H. S. Goodman, the judge who tried this cause, shall upon examination of said bill of exceptions duly made, in connection with said affidavits and other evidence and on his own knowledge find that the notes of the stenographer of the evidence taken in this cause and transcribed herein were fraudulently altered before the bill of exceptions was signed and sealed by him, the said judge, so that he, the said judge, was fraudulently imposed upon and induced to sign and seal an untrue and false bill; that then he, the said Hon. C. H. S. Goodman, do from said transcribed notes of the evidence, affidavits and from other evidence as well as his own knowledge, determine what was the evidence which should have been contained in

such bill; and, having thus determined, that he do cause to be prepared a just and true bill of exceptions in this cause, duly signed and sealed by him in duplicate, and that he, the said judge, do forthwith file one of said duplicate bills in the office of the clerk of the Grundy county circuit court, and that he do forthwith forward the other duplicate bill to the clerk of this court; and that he, the said judge, do, on or before the thirty-first day of May, 1893, certify under his hand and seal to this court, how he has discharged this rule and order, together with all evidence taken by him in said cause, together with the bill of exceptions which he shall determine as aforesaid to be the true bill of exceptions herein. And it is further ordered that a copy hereof be duly certified to the Hon. C. H. S. Goodman by the clerk of this court."

On May 31, 1893, the Hon. C. H. S. Goodman reported that in obedience to the mandate of this court he had examined into the matter committed to his care, and having found that the bill of exceptions had been changed and falsified in part, before the same had been signed and filed, and in part afterwards, he corrected the same from the notes of the stenographer and from other legitimate sources, and forwarded the corrected bill to this court together with his report.

This report was duly and fully approved by an order entered to that effect, and the corrected bill of exceptions ordered to be filed and to stand as the true bill, and the cause was submitted on the thirteenth of June, 1893, without argument.

Mrs. Minnie Hall, a widow, lived on a farm some five and one-half miles southwest of Brookfield, in Linn county. Her family consisted of four children, William, May, Nettie and Roy, aged respectively nine, seven, five and three years. The family lived alone, the husband and father, Ansel Hall, having died some

time in 1887.  The nearest neighbor lived about one-half mile distant.  On the night of Saturday, the nineteenth of January, 1889, at about eleven or half-past eleven o'clock, Mrs. Minnie Hall's house, was discovered to be in flames.  The neighborhood was comparatively thickly settled and the neighbors quickly thronged to the scene.  The house was a small pine frame, and underneath a considerable portion of it there was an old unused cellar.  At first, owing to the intense flames, nothing could be discovered but the blazing building; but pretty soon, so rapidly did the light materials of the dwelling consume, one of the sides burned away, which exposed to view the interior, then Mrs. Hall, the mother, was seen kneeling by the side or partly lying on a bed, her hair burned away, disclosing a wound on the top of the skull, as though it had been cut open, crushed or the top knocked off.  The body of one of the little girls was seen lying across the bed with her head split open similar to her mother's. the bodies of the other children were not then seen. Underneath a portion of the house was an unused cellar.  An effort was made to pull the body of Mrs. Hall out of the flames, but the heat was so great it was found impossible.  Just then the flooring gave way and fell into the cellar.  When this occurred the body of the little child, Nettie Hall, fell into the outside entrance of the cellar, and with a long rod, which had been procured in the meantime, it was drawn out, and, although considerably burned, was identified without difficulty.  Her skull was found to be crushed or cut open.  The other bodies were not rescued from the flames, and only the trunk of the mother's body, the spinal columns and portions of the bones of the other children were found in the ruins.  Upon an examination of the *debris* in the cellar a human *fœtus*, which had probably reached the sixth or seventh month of

gestation, was found in a pile of ashes. It had evidently been placed there before the fire, because it showed no marks of heat. It had snowed that night, a heavy, damp, clinging snow, and the ground was covered to the depth of three or four inches.

After the fire, the sky cleared up. It was a moonlight night, and the persons present discovered tracks in the snow of one person leading from the house in a southeasterly direction to a large pile of hay which laid against the north end of the barn, which stood some sixty yards distant; a portion of the top of this pile of hay, which was covered with snow, had been turned back and an armful of dry hay removed. The tracks, and here and there straws from the hay, showed that the person had returned to the house with the armful. Immediately under what had been the floor, against the bank of the cellar, near the northeast corner of the house, a pile of hay was found still burning. Further investigation disclosed tracks of one person leading away from the house. These tracks were fresh in the snow, as though the party had recently made them.

Four young men, Lisher, Skowton, Smith and Hall, started at once on the trail. They traced them plainly and rapidly, as the moon was shining, and they were aided by the snow, first to a haystack in the corner of the meadow, then north some thirty-five rods over a fence, thence northwesterly until they came to a little branch, or small stream; there the person seemed to have stopped and turned, and retraced his steps until he came to a point where he could see Mrs. Hall's house; there the tracks went east; this was in a woods pasture; thence through several farms and a woods pasture in which there was underbrush, until they came to the road going to Brookfield, which the tracks had not followed before; thence across another farm down by a creek and back again into the Brookfield road.;

thence along the main road until a corner is reached; instead of turning around the corner the tracks went northward until they reached the middle of the railroad track; thence along the railroad track westward toward Laclede, a station west of Brookfield; after walking up the railroad a few rods the person walked or stood around near the same place for a short time, when he retraced his steps, but not exactly in the same way he had gone, until he came to a cattleguard; thence across a bridge in a hollow in a yard or lot, where the person seemed to stop or turn and stand; thence to the railroad yards at Brookfield; thence across a street running east and west until the Clark hotel is reached.

At this point two of the pursuers went to hunt the city marshal, while the other two continued on the trail. They followed it without difficulty into the railroad yards, when they were joined by a railroad hand, who was doing night work in the yards. The railroad hand went down one side of a line of cars standing in the yard, while the two young men followed along on the other side. In a few minutes the railroad man espied a man running, and hallooed to the two young men, "here he is, here he goes." They were then joined by the city marshal and their two companions and several railroad yard-men, who had seen a man come into the yards (whom they afterwards recognized as Howell, the defendant), and the pursuit was continued down through the yard among the number of freight cars, out of the yards into a lumber yard on Main, where a switchman, Owen McKinney, who had gone there to watch for the fleeing party, saw a man climb over a high fence around the lumber yard and pass him; as he did so McKinney held his lantern up full in his face and recognized him subsequently as Howell.

Howell then ran up Main street about a block, turned west on another street and went to Babb's hotel, called

for a room, went up stairs, and when the pursuing party reached there and the marshal went into the room and arrested, him, he (Howell) had undressed, but the bed had not been disturbed. His pants were wet above the knees. and the lower part of his overcoat was wet and also his cap, and down around the roll of it was snow that had not melted. When the marshal told Howell to dress himself the latter asked, "what does all this mean?" The marshal replied that there had been a house with a woman and four children in it burned. To which Howell said, "I haven't been in the country to-night." The marshal replied, "I didn't say the house was in the country." To which Howell made no reply.

As he was fleeing through the railroad yards the night of the murder, he was positively identified by the following witnesses: Cullatin, Miller, McKinney, within two feet of him as he jumped over the lumber yard fence, and flashed his lantern in his face, and Elmer Plopper, a switchman who was ten or fifteen feet away from him.

Howell is a first cousin of Mrs. Minnie Hall's. He had come into the neighborhood where she lived in March, 1887, and secured employment as a farm hand. During the greater portion of the time that had elapsed between his coming to the neighborhood and the date of the crime, he had worked for different farmers in the immediate vicinity of her home. From time to time he was at her house, kept his trunk and clothes there, and she did some of his washing. For several weeks preceding the murder of Mrs. Hall and her children and the burning of their home, Howell had been teaching a country school some four or five miles south of Mrs. Hall's, in the edge of Chariton county.

Some two or three weeks before the date of the crime, Henry Smith, a witness for the state, who had come to the county with Howell, and who was then at

work for a Mr. Vorce, who lived in the neighborhood, states that Howell came to Mr. Vorce's and asked him to go with him over to Mrs. Hall's; that he went, and on the way, Howell said that he had been criminally intimate with his cousin, Mrs. Hall, and that she was pregnant, and asked Smith what he should do; Smith says he advised Howell to complete his term of school and leave the country; that they went to Mrs. Hall's and remained for dinner; that after dinner Howell and Mrs. Hall went into a room adjoining the room in which Smith was, and he overheard them talking about Mrs. Hall's condition; that Howell became angry and talked very abusively to Mrs. Hall about it; that about two or three o'clock in the afternoon Howell and Smith together left Mrs. Hall's; on the way Howell again brought up the subject of Mrs. Hall's condition; told Smith that she was in a family way, and that he was the father of the child; that she had been taking medicine to produce an abortion, but that it had failed to do so, and finally wound up by saying that if Mrs. Hall did not get rid of the "damned young one" he would; that he did not intend to have his reputation ruined on account of it. Smith again advised him against such a course; told him that it would be committing a crime to produce an abortion; that he had better teach his school out and leave the country; Howell swore that he would be "damned" if he would do it, that the "damned thing" had to be got rid of.

The evidence also showed that Howell was at Mrs. Hall's house about three o'clock in the afternoon of the nineteenth of January, the day preceding the night when Mrs. Hall and her children were murdered, and remained for some time; that he went to Brook-field, reaching that place about five o'clock; that he left Almsoth's store the second time about ten or

fifteen minutes before eight o'clock, as Hollis Lawson testifies; that about eight o'clock he was seen going south on Main street in Brookfield and in the direction of Mrs. Hall's; that a few minutes after eight o'clock he was seen by Walter Mitchell who knew him well, who had done business for him and who passed in five or six feet of him, about a mile and a quarter south of Brookfield, going south on the direct road toward Mrs. Hall's.

Crutchfield, the city marshal, on the next day, Sunday, took the precaution to cover up with boards some of the tracks defendant made in the snow in the lumber yard, and the next day he went to Linneus, obtained from the sheriff defendant's shoes, and they corresponded in every particular with the tracks defendant had made in the lumber yard. Just one week before the twentieth of January, 1889, defendant had purchased of a merchant in Brookfield a pair of artic overshoes, and one of the young men who followed on his trail from Mrs. Hall's home towards Brookfield, says that the tracks showed that they were made by new overshoes, because the creases which appear in the bottom of new overshoes, showed plainly in the snow where these tracks were made.

While in jail Howell confessed to three different persons who were confined there for minor offenses; to one he said that he had attempted to produce an abortion on Mrs. Hall, and that she died from the effect of it; that he then took a hatchet and killed the boy; "murdered the children next, then saturated the bed and the clothes of the children with kerosene oil." He wanted this witness to procure him some acid as soon as he got out and send it to him by a Mr. Brinkley, marked "rose-water," to enable him to cut out of jail and escape. To another, Howell said "that he had murdered Minnie Hall and the children.

\* \* \* Took the axe and knocked her (Minnie Hall) in the head. \* \* \* Went back into the house, met the little boy in the other room; knocked him in the head with the axe; I went in the other room and killed the other little children in the bed."

The defense relied on in the lower court is an *alibi*, defendant claiming that after reaching Brookfield about six thirty o'clock, he never left the town that night. But if, as he states, he reached Minnie Hall's at four o'clock, and after being there just long enough to get some handkerchiefs, six or eight minutes, he left then for Brookfield, he must have been almost two and one-half hours on the road, which would be an unreasonable time in which to go over a space of five and one-half miles, by as thoroughly a trained walker as defendant is shown to be. But the testimony of defendant as to his whereabouts in town, and as to the length of time he remained there and what way he employed his time from half past six o'clock to about ten minutes past three o'clock in the morning when he was arrested at the Babb hotel is by no means satisfactory. His claim is that he wanted to go out with some farmer friend out toward the neighborhood of Griffiths where he boarded, which was some ten and one-half or eleven miles southwest of Brookfield, and failing in that, that he wanted to go out on the railroad westward to Laclede, which would only have saved him some two and one-half miles of walking; but he never went to the depot or to any railroad agent to inquire when the trains left going west, and if the story of Henry Thornton be true, who says defendant saw him in Brookfield at 9:30, and asked him if he was about to start out with his team, defendant would have had an opportunity of going out with Thornton, who lived within some four or five miles of the locality to which defendant wished to go. The story is utterly

improbable that defendant in order to save only two and one-half miles. walking, by taking a train going west to Laclede, would have failed to make inquiries from proper sources as to the time of the trains, and yet kept on his feet walking around over the town after he had transacted his business, from 7:30 P. M. to 2:30 A. M. It is true that Stroude, who had been in Linneus jail, testified that he saw defendant in Brookfield about 10:20 that night, but the jury no doubt preferred to believe the far more probable story told by numerous witnesses for the state.

The defendant does not attempt to account for the condition of his clothes, and simply says in regard to Smith's testimony, and that of the others in regard to his confessions, that they are false. He admits his attempt to break jail, or that he wanted to escape. The credit of many of the witnesses on both sides is impeached, among them that of Thornton and Stroude. But the witnesses for the state, especially those who pursued and arrested the defendant, stand unimpeached.

The chief defense relied on in this court proceeds on the theory of an entire lack of proof of the *corpus delicti;* but since the bill of exceptions has been corrected as aforesaid, this contention, it may well be supposed, has been abandoned, though the briefs of defendant's counsel making that point very conspicuous have not been withdrawn.

The instructions given in the cause, as well as those refused or modified, are as follows:

"1. The court instructs the jury that if they believe and find from the evidence in this cause beyond a reasonable doubt that at the county of Linn, and state of Missouri, the defendant, Joseph A. Howell, did on the nineteenth day of January, 1889, or at any time prior to the finding of the indictment in this

cause feloniously, willfully, deliberately, premeditatedly and of his malice aforethought, kill and murder one Nettie Hall in the manner and form charged in either count of this indictment, you should find the defendant guilty of murder in the first degree and so state in your verdict.

"2. The court instructs the jury that by the term 'feloniously' is meant wickedly, and against the admonition of the law; that is, wickedly and unlawfully. By the term 'willfully' is meant intentionally, and not by accident. By the term "deliberately" is meant done in a cool state of the blood; it does not mean brooded over or considered or reflected on for a week or a day or an hour, but it does mean an intention to kill, executed by a party not under the influence of a violent passion suddenly aroused, and the passion here referred to is that only which is produced by what the law recognizes as a just cause of provocation. By the term 'premeditation' is meant thought of before hand for any length of time, however short. The term 'malice' as used in the indictment does not mean in a legal sense mere spite, ill will, hatred or dislike, as it is ordinarily understood, but it means that condition of the mind which prompts one person to take the life of another person without just cause or justification, and signifies the state of disposition which shows a heart regardless of social duty and fatally bent on mischief; and 'malice aforethought' means that the act was done with malice and premeditation.

"3. The jury are instructed that in criminal cases circumstantial evidence is legal and competent to establish the guilt or innocence of the defendant; that if in this case the evidence be such that upon a full and fair examination of all the facts and circumstances you are satisfied of the guilt of the defendant as

charged, beyond a reasonable doubt, it is your duty to find the defendant guilty.

"4. The jury are instructed that, while the law makes the defendant in this case a competent witness, still, the jury are the judges of the weight which ought to be attached to his testimony; and in considering what weight ought to be given it, the jury should take into consideration all the facts and circumstances surrounding the case as disclosed by the evidence, and give the defendant's testimony only such weight as they believe it entitled to in view of all the facts and circumstances proved on the trial.

"5. The jury are the sole judges of the credibility of the witnesses, and of the weight and value to be given to their testimony. In determining such credibility, weight and value, the jury should take into consideration the character of the witnesses, their manner on the witness stand, their interest, if any, in the result, their relation to, or feeling for or against, the defendant or deceased, the probability or improbability of their statements, as well as of all the facts and circumstances given in evidence in this cause; and in this connection you are instructed that, if you shall believe from the evidence that any witness or witnesses have willfully testified falsely to any material fact in this cause you are at liberty to disregard the whole or any part of such witness or witnesses' testimony.

"6. If the jury believe beyond a reasonable doubt from all the facts and circumstances as detailed in evidence in this case that the defendant is guilty of the crime as charged in the indictment, then in that case it is the duty of the jury to find the defendant guilty, even though the jury may be satisfied from the evidence that the defendant sustained a good character and reputation previous to and up to the time of the commission of the crime charged.

"7: The jury are instructed that to authorize an acquittal on the ground of reasonable doubt alone, such doubt should be a substantial doubt arising out of the evidence, and not a mere possibility that the defendant is innocent.

"8. The court further instructs the jury that if they believe and find from the evidence that the defendant made any statement or statements in relation to the homicide charged by this indictment, after said homicide is alleged to have been committed, the jury must consider such statement or statements all together. The defendant is entitled to the benefit of what he said for himself, if true, and the state is entitled to the benefit of anything he said against himself in any statement or statements proved by the state. What the defendant said against himself the law presumes to be true because said against himself. What the defendant said for himself the jury are not bound to believe because it was said in a statement or statements proved by the state; but the jury may believe or disbelieve it as it is shown to be true or false, by the evidence in this cause; it is for the jury to consider under all the circumstances how much of the whole statement or statements of the defendant proved by the state the jury from the evidence in this cause deem worthy of belief.

"9. The court instructs the jury that while an attempt to escape, of itself, does not establish the question of guilt or innocence, yet if the jury believe from the evidence that the defendant while confined in the Linn county jail, charged with the commission of the crime of which he is now being tried, attempted to escape therefrom then the jury may take such fact into consideration in connection with all the other facts detailed in evidence in determining the guilt or innocence of the defendant.

"10. The court instructs the jury that if they find the defendant guilty, their verdict may be in the following form: "We the jury find the defendant guilty of murder in the first degree in manner and form as charged in the indictment."

"1. The court instructs the jury that the indictment preferred against the defendant in this case is a mere formal accusation and is of itself no evidence whatever of his guilt. Before the jury can find the defendant guilty they must believe, and find from the evidence before them, and that beyond all reasonable doubt, that he, the said defendant, and in the manner and by some of the means mentioned in the said indictment, willfully, intentionally, deliberately and premeditately on purpose and with malice aforethought, did kill the said Nettie Hall. And the court further instructs the jury that by the term reasonable doubt is meant that state of the case which after the entire comparison and consideration of the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty that the charge is true.

"2. The court instructs the jury that if the whole evidence in this case leaves their minds in such condition that they are neither morally certain of the defendant's innocence, nor morally certain of his guilt, then a reasonable doubt exists, and the jury must give the defendant the benefit of such doubt and acquit him.

"3. The court instructs the jury that before they can find the defendant guilty of the crime charged against him in this case, they must believe and find from the evidence before them, and that beyond a reasonable doubt and to a moral certainty, *first*, that said Nettie Hall was killed and murdered as charged in the indictment; *second*, that the defendant was present

at the time and place mentioned in said indictment and did then and there willfully, intentionally, deliberately and premeditately and of his malice aforethought, in the manner and by some of the means specified in said indictment, kill the said Nettie Hall, and unless the jury so find they are bound to acquit the defendant.

"4. Evidence of alleged declarations, confessions or conversations of defendant should be received by the jury with great caution, taking into consideration the liability of witnesses to forget or misunderstand what was really said; to misquote the language used; the failure of defendant to have expressed his own meaning; or of the witness to comprehend the meaning intended to be conveyed; the infirmity of human memory; the probability of the witness, intentionally or unintentionally changing or altering the expression used.

"5. The jury are instructed if they have a reasonable doubt that the defendant committed the homicide alleged in the indictment or was present at the time said homicide is alleged to have been committed they will find a verdict acquitting defendant.

"6. The court instructs the jury that in making up their verdict as to the guilt or innocence of defendant they must consider the evidence offered in his behalf as to his previous good character just like any other fact in this case; and if, after duly weighing and considering such evidence of good character along with the other evidence in this case, it does not appear to the jury that defendant is guilty of the charge preferred against him beyond all reasonable doubt, then the jury should acquit the defendant.

"7. The jury are the sole and exclusive judges of the credibility of the witnesses and they are not bound to give to the testimony of any witnesses any other or greater weight than from all the facts and circum-

stances they deem it entitled and in determining what weight, if any, they will give to the testimony of any witness, they may take into consideration the probability or improbability of the truthfulness of the statement of such witness on the stand, their prejudice or bias in this cause in giving their testimony.

"8.   Under the law the defendant is a competent witness to testify in his own behalf, and the court instructs the jury that they should fairly and impartially weigh and consider the evidence of the defendant who has testified in this case, along with the other evidence before them.

"9.   It is agreed in this case that Wm. Adams, on the night of January 19, 1889, about two o'clock A. M. while working with James Cullatin, Patrick Flynn and others, saw a man in the Hannibal & St. Joe Railroad yards in Brookfield, Missouri.   That he, said Adams, was within plain view and within twenty-six or twenty-eight feet of said man.   That he saw said person in said yards two or three times; that he did not and could not recognize said person; that afterwards, when defendant was arrested, and he saw him and could not and did not recognize him as being the man he so saw in said yards.   Therefore, the jury must take this admission as conclusive of the facts stated by him and in determining their verdict in this case will exclude from their consideration all evidence contradictory of, or inconsistent with, said admissions.

"10.   (The prosecution seeks a conviction of the defendant in this case upon what is known in law as circumstantial evidence.)   In order to justify the conviction of defendant upon circumstantial evidence alone, the court (therefore) instructs the jury that it is not sufficient to justify them in convicting the defendant upon such evidence that the facts proved coincide with, account for and even render probable the

hypothesis sought to be established. But they must exclude to a moral certainty every other hypothesis but the one sought to be established, viz.: the guilt of defendant. And unless all the facts and circumstances proved are consistent with each other and with the guilt of the defendant and absolutely inconsistent with, and unexplainable upon, any other reasonable theory than that of defendant's guilt, the jury under the law would not be justified in convicting the defendant upon such evidence, but ought to acquit him.

"11. The jury are instructed that where the prosecution relies upon circumstantial evidence alone for a conviction (as in this case) the jury must be satisfied beyond a reasonable doubt that the crime has been committed by some one in manner and form as charged in the indictment, and they must not only be satisfied that all the circumstances proved are consistent with defendant's having committed the act; but they must also be satisfied that the facts are such as to be inconsistent with any other reasonable conclusion than that the defendant is the guilty person; and if the material facts necessary to a constitute a chain of circumstances sufficient to authorize the jury in convicting the defendant under the other instructions herein are wanting in a single link in such chain, that it is sufficient to raise a reasonable doubt and the jury should acquit the defendant.

"12. The law presumes the defendant innocent of the crime charged against him, and the burden of proof rests upon the state to make out and establish by the evidence beyond a reasonable doubt and to the satisfaction of the jury, every fact and ingredient necessary to show his guilt, and upon the whole case the evidence must be so strong and convincing as to establish in the minds of the jurors the guilt of the defendant to a moral certainty before the jury are authorized to find

him guilty. If, therefore, after a full and deliberate consideration of all the evidence before them in the case the jury entertain any reasonable doubt of the defendant's guilt they should give him the benefit of such doubt and acquit the defendant.

"13. In every case where there is a crime charged against a citizen, the law clothes the citizen charged, with the presumption of innocence. That is, the law presumes said citizen did not commit and is entirely innocent of, the crime charged, and so strong is this presumption that it clings to, surrounds, shields and protects the citizen until it is overcome, and proved by the evidence that such presumption is in truth and in fact false, and that the citizen is beyond all reasonable doubt guilty of the offense and crime as charged; and in this case defendant is not only clothed with the presumption of innocence attaching to every citizen charged with the commission of a crime (before mentioned), but he is clothed with the further presumption of the law that, by reason of his kindred (blood) relationship with deceased (if such there was) he would be less likely to commit the offense charged than if such kinship had not existed, and before the jury would be warranted in depriving him of these presumptions with which the law clothes him as aforesaid the evidence must be so strong, clear and conclusive as when considered in the light of each of these favorable presumptions the previous good character (if such has been proven) and of all other facts and circumstances in evidence to leave no reasonable doubt in the minds of the jury and that he, notwithstanding such favorable presumptions, kinship, character and circumstances, the defendant committed the offense charged.

"14. When the state seeks to convict upon circumstantial evidence each fact in a chain of facts from which the main fact in issue is to be inferred must be

proved by competent evidence and by the same weight
and force of evidence as if each one was the main fact
in issue and all the facts proved must be consistent
with each other as well as with the main fact to be
proved.

"15. The jury in making up their verdict will dis-
regard all evidence tending to show that defendant was
not talking to Lawrence Lawson in the store of witness
Almroth in Brookfield at about fifteen minutes past
eight o'clock on the night of January 19, 1889, or that he
did not remain a few minutes thereafter talking to said
Lawson, as the law conclusively presumes that the
statement of said Lawson in this regard is true.

"16. The law requires that no man shall be con-
victed of a crime until each and every one of the jury
are satisfied, by the evidence in the case, to the exclu-
sion of every reasonable doubt, of his guilt as charged;
so in this case, unless the jury are satisfied by the evi-
dence of defendant's guilt as charged, beyond all rea-
sonable doubt and to a moral certainty, they should
acquit him; and if any one of the jury have a rea-
sonable doubt as to defendant's guilt, they cannot
convict him.

"17. The court instructs the jury that on the previ-
ous trial of this cause it was admitted and agreed by both
the state and the defendant that one, Lawrence Lawson,
would testify 'that he, said Lawson, was talking with
defendant in the store of witness Almroth in Brookfield
at about fifteen minutes past eight o'clock on the night
of January 19, 1889, and that he, defendant, remained
there in said store a few minutes thereafter talking to
said Almroth.' The court therefore instructs the jury
that such admission must be taken as a fact, and in
their consideration of their verdict in this case they
will exclude all evidence contradictory of, or inconsist-
ent with, such admission.

"18. Under the law and the evidence the jury must find the defendant not guilty."

The application for a continuance, filed September 29, 1891, so far as necessary to quote it, is the following:

"That one, Virgil Williams, is a material and important witness for the defendant; that he resides in the town of Trenton, in the county of Grundy, in the state of Missouri; that his folks and family resided here and that said Williams is now temporarily absent from his said home; that he has been so absent for about six or seven weeks; that, about the fourteenth day of August, defendant's attorneys made inquiry of the relatives of said Williams, and others, his friends, and that they informed said attorneys that said Virgil Williams was, as they believed, in the city of Chillicothe, in the county of Livingston, in the state of Missouri; that on said fourteenth day of August, A. D. 1891, the defendant caused a subpœna to be issued by the clerk of this court and delivered to the sheriff of said Livingston county, Missouri, and that on the seventeenth day of August, 1891, said sheriff, as shown by his return herewith presented, made return of said subpœna that said Williams could not be found in his said county of Livingston; that defendant is informed and believes, and so states the fact to be, that said Williams is but temporarily absent from his home in Trenton, Missouri, and that he is expected to return in a few weeks from this time to his said home in Trenton, Missouri; that the exact whereabouts of said Williams has not been known to the defendant or his attorneys or the said friends and relatives of said Williams since said Williams left here up to the present time; that one Owen McKinney has been subpœnaed by the state as a witness against this defendant; that defendant believes that on the trial of this cause the state will, as

they have heretofore done, introduce said McKinney as witness against this defendant; that said McKinney will swear that on the night of the nineteenth of January, 1889, he saw this defendant just across the street from a certain lumber yard in the town of Brookfield in the county of Linn, and near the railroad yards in said town, and that he recognized and identified the man that he so saw as being this defendant; that if said Williams was present he would testify that about the twenty-seventh of April, just about one day before the examination of the witnesses begun on the trial of this case, at the April term of the court that said Owen McKinney, witness for the state aforesaid, and at the Evans House, a hotel in said town of Trenton, where said McKinney was then stopping, or at, said, in the presence and hearing of said Williams, and to one, E. D. Larkins, in response to a question by said Larkins to said McKinney, asking what he, McKinney, was doing here; that in reply thereto said McKinney said in substance and as follows: 'That he, McKinney, had come up here to swear against Joe Howell; that he did not know any more about the case than did he, Larkins; that he didn't know whether it was Joe Howell that he saw that night by the lumber yard or not; that he didn't know any better than he, Larkins, knew who it was; that he said that he had been paid to come up here as a witness, and that he was getting good money out of it; that said Virgil Williams is not present at this court, and defendant has been unable to learn of his whereabouts so as to have his deposition or to have him subpoenaed; that E. D. Larkins is a material and important witness for the defendant; that defendant is informed and believes, and so states the fact to be, that said E. D. Larkins resides in the town of Trenton, in said county and state; that the wife of said E. D. Larkins resides in this town; that said Larkins left this

town and his home here in Trenton about the first day of August, A. D. 1891, to look for a job on the railroad; that he is a railroad man and follows the occupation of railroading for a livelihood; that he left this town as aforesaid, to be only temporarily absent in order to look around for a job of railroading; that, about the thirteenth day of August, 1891, the wife of said Larkins learned that her husband was in the city of Quincy, in the state of Illinois, and so informed plaintiff's attorneys, whereupon and about that date plaintiff's attorneys made inquiry in said city of Quincy, and learned, and affiant states the fact to be, that said Larkins left said city at said time, and that said Larkins will return to his home in said town of Trenton in a short time and in a few weeks; that defendant does not now know, neither has he been able to learn, of the exact whereabouts of said Larkins since he left said city of Quincy; that said Larkins, if present, would swear that at the Evans House, a hotel in said town of Trenton, and on about the twenty-seventh day of April, 1891, one, Owen McKinney, said to witness Larkins in the presence and hearing of one, Virgil Williams, that he, McKinney, had come up here to swear against Joe Howell; that he did not know any more about the case than did he, Larkins; that he didn't know whether it was Joe Howell that he saw that night by the lumber yard, or not; that he didn't know any better than he, Larkins, knew who it was; that he said that he had been paid to come up here as a witness, and that he was getting good money out of it; that said Larkins is not present at this court, and defendant has been unable to learn of his whereabouts so as to subpœna him or take his deposition; that one, Wm. Adams, is a material and important witness for the defendant in these cases and in each of said cases; that he resided in the town of Brook-

field, in the county of Linn, in the state of Missouri, and has for some years past so resided there and up to about the fourteenth day of August, 1891; that his family is still in said town of Brookfield, and still reside there, as defendant is informed and believes and so states the fact to be; that about said time he ceased the employ of the Hannibal and St. Joseph railroad at that place and left his home, in said Brookfield to look for or seek employment with some railroad; that he is temporarily absent from his home, so seeking employment, and will be absent for several weeks until he procures employment, when he will and intends to return to his family; that defendant has been unable to locate or find where said witness is or where he went for employment, or to find his whereabouts, but that in a few weeks said Adams will return; that on said fourteenth day of August, 1891, defendant caused a subpœna to be issued for said witness by the clerk of the court and delivered to the sheriff of Linn county, Missouri, where defendant believed said witness was and where he knew he resided, not having been informed or learned or ascertained of his severance with said railroad or his intention to seek employment elsewhere, but that said sheriff made return of said subpœna on the twenty-first day of August, 1891, which subpœna defendant herewith presents to the court that he could not find said witness in Linn county, Missouri; that said witness would testify, if present, that: 'I was switchman in the employ of the Hannibal and St. Joseph railroad company in the Brookfield yard on the night of the nineteenth of January, 1889. While there at work helping to make up a train with Pat Flynn, James Cullatin and others, I saw a man in the yard there and was within twenty-six or twenty-eight feet of him; afterwards I saw him again two or three car lengths away. I do not know who the man was; I can-

not say the defendant was the man.   Mr. Crutefield the town marshal, and two or three other men came along, they said tracking a man.   James Cullatin and myself joined with them.   That he saw this man in the yards that night some two or three times, and at neither time, whether alone or with the others so tracking, could he say that he recognized the man or that defendant is the man he saw.   That he did not know the man;' that said witness is not present at this term of court, and that on the trial it will become and be a material issue and question as to whether the defendant was in the city of Brookfield from about the hour of six o'clock P. M., of the nineteenth day of January, 1889, all the time on up to about the hour of midnight or twelve o'clock of that night; that the state will, as it has heretofore done, claim upon said trial that at nine o'clock P. M., and prior thereto of said night and on up to about midnight of said night the defendant was absent from and not in the city of Brookfield aforesaid."

Other facts incident to the trial of the cause will be adverted to further on.

*A. W. Mullins* and *Harber & Knight,'* for appellant.

(1)  The evidence on the trial does not establish the alleged homicide or death of Nettie Hall, the person charged in the indictment to have been killed and murdered by the defendant.   *Ruloff v. People,* 18 N. Y. 179, and cases cited; *People v. Bennett,* 49 N. Y. 137; *People v. Schriver,* 42 N. Y. 1; *People v. Palmer,* 4 Am. St. Rep. (109 N. Y., 110) 423; *High v. State,* 8 Am. St. Rep. (26 Texas App. 545) 488; *State v. Williams,* 78 Am. Dec. (7 Jones' Law 466) 248; see note; *Gray v. Commonwealth,* 47 Am. Rep. (101 Pa. St. 380) 733;

*Matthews v. State*, 28 Am. Rep. (55 Ala. 187) 698; *People v. Jones*, 31 Cal. 566; *United States v. Williams*, 1 Cliff. (U. S.) 25; *Smith v. Commonwealth*, 21 Gratt. 809; Wharton on Criminal Evidence, section 325-324 [9 Ed.]; 3 Greenleaf on Evidence, section 30 [14 Ed.]; *Commonwealth v. Webster*, 5 Cush. 295; 52 Am. Dec. 711; *Pitts v. State*, 43 Miss. 472; 10 Central Law Journal, 165; *Regina v. Sharman*, 24 Eng. L. and Eq. 553; *Robinson v. State*, 12 Mo. 592; *State v. Scott*, 39 Mo. 424; *State v. German*, 54 Mo. 526; *State v. Patterson*, 73 Mo. 695; *State v. Dickson*, 78 Mo. 438; *State v. Jones*, 106 Mo. 302. (2) The cross-examination of defendant was unwarranted by the law or facts. The law permitted no cross-examination of him upon matters of which he had not been examined in chief; he was not examined in chief in reference to what he had sworn upon any previous trial of this case as to the giving or writing of any letters to Orr or the giving of a key to said Orr. Nor was he examined in chief concerning one Henry Thornton, the seeing of, or giving or offering him a cigar. We doubt if a more flagrant disregard of the defendant's rights can be found in the books than appear in this. Revised Statutes 1889, section 4218; *State v. McGraw*, 74 Mo. 573; *State v. Porter*, 75 Mo. 171; *State v. Turner*, 76 Mo. 350; *State v. Pattison*, 88 Mo. 88; *State v. Chamberlain*, 89 Mo. 129; *State v. Brooks*, 92 Mo. 612; dissenting opinion of Judge SHERWOOD; *State v. West*, 95 Mo. 139. (3) The court erred in overruling the application for continuance, and the so doing, by reason of the agreement of the state that the facts stated in the application, as the evidence of Wm. Adams might be read and taken as his testimony but emphasized the error. *State v. Berkley*, 92 Mo. 41; *State v. Warden*, 94 Mo. 648; *State v. Dyke*, 96 Mo. 298; *State v. Loe*, 98 Mo. 609. The evidence of Williams and Larkins was competent and important

to defendant, and having used all diligence possible to secure the same, he was entitled to the benefit thereof. (4) Evidence of defendant's attempt to escape, break jail, after his conviction in the Linn county circuit court and while the cause was pending in the supreme court, was not admissible, and the court erred in admitting such evidence and giving instruction number nine, on part of the state, in reference thereto. (5) An admission of a fact once made in a cause and becoming a part of the record thereof, can never thereafter in the same cause be receded from or questioned, hence the court erred in permitting Lawrence Lawson as a witness on the last trial of this cause to contradict the statement, previously admitted, and entered of record as true, as, and to be, his evidence, the same having been made of record, and in refusing to give on this question defendant's instructions numbered 15 and 17. *Carroll v. Paul*, 19 Mo. 102. (6) The fourth instruction given on behalf of the state is clearly erroneous. ''The statute makes a defendant prosecuted for a crime a competent witness in his own behalf, but the fact that he is the person on trial may be shown for the purpose of affecting the credibility of such witness.'' The law places no other infirmity upon his evidence; in other respects he stands as any other witness and has the same right to have his testimony estimated by the jury for what they may regard it worth. Revised Statutes 1889, section 4218; *State v. Sanders*, 106 Mo. 188; *State v. Banks*, 73 Mo. 592; *State v. Palmer*, 88 Mo. 572; *State v. Austin*, 113 Mo. 538. (7) The separation of the jury was in violation of the statutes and this alone should have entitled the defendant to a new trial. (8) There was not sufficient evidence, in fact there was not even a *scintilla* of evidence, to justify or support a finding that Nettie Hall was dead or that any of the remains were identified as her remains, and therefore defendant's

instruction that "under the law and the evidence the jury must find the defendant not guilty," should have been given and the defendant acquitted; he is therefore entitled to his discharge here. *People v. Jones*, 31 Cal. 566; *United States v. Mulvaney*, 4 Park Cr. 164; *People v. Bennett*, 49 N. Y. 137; *State v. Fuchs,* 17 Mo. App. 458; *Musser v. Harwood*, 23 Mo. App. 495, and cases; *State v. Greenup*, 30 Mo. App. 299; *State v. Brinkman*, 40 Mo. App. 284; *State v. Bach*, 25 Mo. App. 554; *State v. Snyder*, 44 Mo. App. 429; *State v. Haywood*, 83 Mo. 299; *Hunt v. Railroad*, 89 Mo. 607 and cases cited.

*R. F. Walker*, Attorney General, and *Morton Jourdan*, assistant, for the state.

(1) The court properly overruled defendant's application for a continuance. *Betts v. State*. 66 Ga. 508; *McDermott v. State*, 89 Ind. 187; *Steele v. People*, 45 Ill. 152; *McNeally v. State*, 17 Fla. 198; 3 Parker 199; *State v. Pagels*, 92 Mo. 300; *Porter v. State*, 3 Lea (Tenn). 496; Whar. Cr. Prac. & Pl., sec. 592. The discretion of the trial court in overruling a motion for a continuance will not be interfered with on appeal, unless it appears that it has been unusually or oppressively exercised. Every presumption will be made in favor of the trial court's ruling. *State v. Steen*, 115 Mo. 474; *State v. Marshall*, 115 Mo. 383; *State v. Carter*, 98 Mo. 176; *State v. Gamble*, 108 Mo. 500. (2) The alleged separation of the jury was not of a character to cause a reversal of the judgment. *State v. Orrick*, 106 Mo. 127; *State v. Sansone*, 116 Mo. 1. (3) The alleged misconduct of one of the jurors in trying on the overshoe identified as that of the defendant constituted no ground for a new trial; no objection or exception was properly saved to said alleged conduct. *State v. McDaniel*, 94 Mo. 301; *State v. Carter*, 98 Mo. 176;

*State v. Bulling*, 105 Mo. 226. (4) Remarks of counsel which are deemed objectionable, should be made a ground for motion for new trial. *State v. Elvins*, 101 Mo. 243; *State v. Taylor*, 98 Mo. 240; *State v. Grote*, 109 Mo. 345. (5) Nor will new trials be granted when the object of the newly discovered testimony is merely to impeach the character and credit of a witness. *State v. Welsor*, 21 S. W. Rep. 443. (6) Evidence of an attempt on the part of an accused to escape from custody is always admissible as tending to show guilt. *State v. Moore*, 101 Mo. 316; *State v. Jackson*, 95 Mo. 623; *State v. Mallon*, 75 Mo. 355. (7) Any conduct on the part of an accused indicating a consciousness of guilt, such as flight, escape, attempt to escape or prison breach, is legitimate evidence. *State v. Moore, supra*; *Clark v. State*, 8 Cr. Law. Mag. 19; *People v. Petmecky*, 2 N. Y. Cr. R. 450; *People v. Standley*, 47 Cal. 113; s. c., 2 Cr. L. R. (Green) 437. (8) The instructions properly declared the law and were approved by the court on the former appeal. *State v. Howell*, 100 Mo. 628. The one as to the credibility of the witnesses and the weight and value to be given their testimony has received the sanction of this court. *State v. Buchler*, 103 Mo. 203.

SHERWOOD, J.—I. In discussing the various errors assigned for a reversal of the judgment in this cause, attention will first be turned to the application for a continuance heretofore set forth.

There is in this state a statute in which is formulated the statutory grounds for a continuance in criminal cases as follows:

"Section 4181. A motion to continue a cause on the part of the defendant on account of the absence of evidence must be supported by the oath or affidavit of the defendant or some reputable person in his

behalf, showing the materiality of the evidence expected
to be obtained, and that due diligence has been used
to obtain it, and where the evidence may be; and if it
is for an absent witness, the affidavit must give his
name, and show where he resides or may be, and the
probability of procuring his testimony, and within
what time, and what facts he believes the witness will
prove, and that he believes them to be true, and that
he is unable to prove such facts by any other witness
whose testimony can be as readily procured, and that
the witness is not absent by the connivance, procure-
ment or consent of the defendant, and what diligence,
if any, has been used in the premises by the defendant,
and that the application is not made for vexation or
delay merely, but to obtain substantial justice on the
trial of the cause.''

Analyzing this section, it will be found that the
requisites for such an application are: *First.* That it
show the materiality of the evidence expected to be
obtained. *Second.* That it show due diligence has been
used by the defendant to procure such evidence, and in
what that diligence consists. *Third.* Give the name of
the witness, and show where he resides or may be.
*Fourth.* Show the probability of procuring his testimony
and within what time. *Fifth.* State what facts applicant
believes the witness will prove. *Sixth.* That applicant
believes them to be true. *Seventh.* That he is unable to
prove them by any other witness whose testimony can
be as readily procured. *Eighth.* That the witness is not
absent by the connivance, procurement or consent
of defendant. *Ninth.* That the application is not
made for vexation or delay, etc. *Tenth.* Lastly the
application must be supported by the oath, etc.

There are no intendments of law in favor of such
applications, and examining the present one it will
readily appear that it lacks several of the essentials

which the statute prescribes. The application does not comply with the first statutory ground; because it is well established that it is no ground for a continuance that there is an absent witness who can be used merely to impeach the chief witness of the adverse party. Whart. Crim. Pl. & Pr., sec. 592, and cases cited.

No showing of diligence is presented by the application, only a portion of which has been copied; but looking to the original, it is shown that what Williams and E. D. Larkins would testify to, was in relation to Owen McKinney's, a witness who twice before had testified on behalf of the state, making contradictory statements, and was known to defendant "after the trial of this cause in May, 1891." *How long after* this it was known does not appear, nor does it appear that, immediately on its becoming known, the proper steps were taken or the proper process issued to secure the attendance or the deposition of those witnesses; but, in any event, if due diligence had been used in this regard, still the testimony of the witnesses would only have tended to impeach McKinney, who was supported in his testimony as to recognizing defendant as he was running through the railroad yards, by Miller, Cullatin and Plopper, so that even if McKinney's testimony had been overthrown, the result would have remained unaffected. And, besides, the testimony of the absent witnesses mentioned was only to be used to impeach the testimony of McKinney, and, therefore, for the reason already given, furnished no ground for a continuance. The same line of remark applies to the testimony of E. D. Larkins.

As to the witness, Adams, it does not appear *when* defendant became apprised of the knowledge of Adams on the subject, nor what steps he took on that occasion. But the testimony of Adams was wholly unimportant, as it was only of a very weak, negative character; it

simply went to show that he saw a man in the railroad yards that night of the murder whom he did not recognize as the defendant. This was certainly a very trivial ground on which to ask a continuance.

The present application was made with the view to postpone an approaching *third* trial. Nearly two years had then elapsed since the crime had been committed, and it would have required a far stronger showing than that made by defendant to have authorized a continuance; for such applications have no presumptions indulged in their favor, while every reasonable presumption is indulged in behalf of the action of the trial court when it refuses a continuance. *State v. Whitton*, 68 Mo. 91; *State v. Ward*, 74 Mo. 253, and cases cited; *State v. Wilson*, 85 Mo. 134; *State v. Steen*, 115 Mo. 474; *State v. Gamble*, 108 Mo. 500; Kelley on Criminal Law, sec. 321. No error, therefore, occurred in the trial court refusing to continue the cause.

II. Next for consideration is the point that the jury were allowed to separate. The record discloses that while the jury in charge of the sheriff was passing along the street juror Renfro called to his sister, Mrs. Winters, who was on the opposite side of the street, and inquired as to his mother's condition; that with the sheriff he walked partially across the street in full view of the other jurors, and in a tone of voice loud enough to be heard by them, talked to her (his sister) about the anticipated death of their mother. The rest of the jury and the officer in charge heard all this conversation. Renfro was all the time in charge of the sheriff and in full view of the officer and entire jury. This is shown by the affidavits of sheriff Bain, juror Renfro, jurors Dent and Moe and Susan Winters.

We have hitherto ruled that section 4209, Revised Statutes 1889, respecting the non-separation of jurors in capital cases must be strictly observed. *State v.*

*Murray*, 91 Mo. 95; *State v. Gray*, 100 Mo. 523. In this case, however, the state has assumed the burden under the ruling in *State v. Orrick*, 106 Mo. 111, and affirmatively shown the facts aforesaid, which facts directly establish that no such separation has occurred, as would fall within the purview of our statute or former rulings. See, also, *State v. Sansone*, 116 Mo. 1.

III. The motion for a new trial alleges also that after the close of the evidence and against the objections of defendant, one of the jurors was permitted to try on one of the overshoes which had been identified as that of defendant by Denbo, and by deputy sheriff Winters. But the record makes no mention of such an occurrence, and so nothing need be said on this point.

IV. In the motion for a new trial it is claimed that jurors Ford and Cunningham had prejudged the case, were prejudiced against defendant and were therefore incompetent to sit in the cause. These jurors, whose reputations for truth are established by numerous affidavits of residents of the county, deny this. There are, it is true, affidavits to the contrary; but when there are affidavits *pro* and *con* in a case of this sort, it would require a very strong case indeed which would induce this court to interfere and set aside the verdict on that account. *Morgan v. Ross*, 74 Mo. 318; *State v. Cook*, 84 Mo. 40; *State v. Gonce*, 87 Mo. 627.

V. The remarks of Mr. Bain, counsel for the state, in regard to the overshoes, were objected and excepted to at the time, but counsel for defendant at once withdrew his exception, so this left no exception standing. As to the subsequent remarks of the counsel, though excepted to, such exception was not preserved in the motion for a new trial, and consequently occupies a similar attitude to the exception which was withdrawn.

VI. It is insisted that error occurred in the admission of evidence showing that *after the first conviction* of defendant, he planned and endeavored to make his escape, and tried to induce others to assist him therein. Such evidence, tending as it does, to indicate a consciousness of guilt on the part of a prisoner, and therefore a strong motive for escaping, is always competent. *State v. Moore*, 101 Mo. 316; *State v. Jackson*, 95 Mo. 623; *State v. Williams*, 54 Mo. 170; *State v. Mallon*, 75 Mo. 355. And the rule of evidence applies as well to a person in jail after conviction, and while his cause is pending in an appellate court as before; no just distinction can be taken between the condition of a person thus circumstanced, and one upon whom no conviction has fallen or sentence been passed. It is too plain for argument that the same strong incentive would prompt endeavors to escape in the one case as in the other; indeed it may be said with great force of reason, more powerful motives would spur a defendant to make his escape after he has been solemnly adjudged guilty, than before that period.

VII. Contention is made that counsel for the state were allowed to cross-examine defendant in an unauthorized manner. His cross-examination as disclosed by the *present record* has been carefully read, and nothing is discovered therein which does not necessarily, or else legitimately, relate to the subject embraced in his examination in chief, and in thus ruling we adhere to the conclusions heretofore announced in *State v. Avery*, 113 Mo. 475.

VIII. Among numerous other grounds urged in the the motion for a new trial is that if one be granted, he will be able to show that "Gus Pratt" has a bad reputation for truth. To impeach the reputation of an adverse witness is no more a ground for a new trial

than it would be if offered as a basis for a continuance. *State v. Welsor*, 21 S. W. Rep. 443, and cases cited.

IX. Now, as to the instructions: They have been set forth at large in the accompanying statement. The most of them given on behalf of the state are in stereotyped forms, often approved by this court. No special objection is taken in the brief of defendant's counsel to any of them except the fourth instruction; but this instruction when read in connection with the eighth instruction, given at the instance of defendant, and the fifth instruction on the part of the state, placed the point involved fairly before the jury.

On request of defendant the court gave instructions numbered from 1 to 9 inclusive, heretofore set forth. Instructions numbered 10 and 11 were also given, but were first modified, the modifications consisting of omitting certain portions of the original instructions, which omissions are indicated by brackets. These modifications were properly made. As to the tenth instruction, because as originally drawn, it endeavored to make it appear that there was a distinction between the *state* and the *prosecution*, and was calculated to indicate to the jury that the latter was being used oppressively against defendant; something which was highly erroneous and misleading. So as to the eleventh instruction as originally drawn; for there it is assumed that the charge against defendant was supported *only* by circumstantial evidence, when in truth and in fact there was abundant testimony, in addition to that of a circumstantial character, which strongly tended to support the charge contained in the indictment.

As to the instructions 12, 13, 14 and 16 asked for defendant, they were properly refused, either as misstating the law, or else as having been covered by those already given; and instructions 14 and 16 seem to have been purposely so drawn as to mislead the jury.

The State v. Howell.

Relative to instructions 15 and 17, they were framed so as to prevent the *viva voce* testimony of Hollis Lawson from having any effect on the ground, as the seventeenth instruction in effect states that it had been agreed by the state and defendant at a former trial that if he were present he would testify that defendant left Almroth's store on the night of the nineteenth of January, 1889, at "about fifteen minutes *past* eight o'clock," etc., when the oral testimony of Lawson, as heretofore stated, was that defendant left Almroth's store about ten or fifteen minutes *before* eight o'clock, which statement is fully supported by Almroth himself. It would be a singular idea, indeed, if parties litigant by any temporary agreement made merely for convenience, could prevent a witness, if he subsequently comes into court, from telling the truth of the matter, and prevent the jury from regarding oral testimony, if it happens to be opposed by some perfunctory and time-serving agreement that has long since performed its purpose. The instructions mentioned were, therefore, properly refused; and so was the eighteenth in the nature of a demurrer to the evidence, for reasons already and presently to be given.

X. Of the *corpus delicti* is is needless to speak; the facts heretofore related establish the death of the little one beyond peradventure, and no one can read this very voluminous record on which the hand of the spoliator is still freshly and painfully visible, without being profoundly impressed with the confident belief and abiding conviction of the absolute justice of the verdict.

Within the compass of an opinion, only the salient features of the incriminatory circumstances can be given, but those circumstances, though barely outlined, disclose a series of most outrageous murders endeavored to be concealed by the torch-bearing hand of arson.

If Henry Smith is to be believed, and that was matter exclusively for the jury, defendant was the only person in that locality who had and owned a powerful motive which might result in such a crime as here charged, as its legitimate outcome and natural sequel.

Then we have not only motive prompting, but we have defendant saying *"the damned thing has to be got rid of."* That this was done is shown by independent testimony that the crime of abortion had been perpetrated. This utterance of defendant in reference to the removal of the fruit of his crime by the commission of abortion, is what is commonly called "declarations of intention," it being common for persons about to engage in crime to make similar observations. Such declarations are of great moment when clearly connected by independent evidence with some subsequent criminal action, for the effect of such language is to render it less improbable that a person so speaking would commit the offense charged, and serves to explain the real motive and character of the action. Burrill's Circumstantial Evidence, 338.

But, in addition to the foregoing, we have testimony showing that defendant was at the scene of the crime between three and four o'clock of the afternoon of the same day it was committed. He is next seen on his way to Brookfield, where, after remaining some hours, he is next seen about eight o'clock going south on the Main street of that town; then a few minutes afterward a mile and a quarter distant, still further south and on the road toward Mrs. Hall's; then soon we have the blazing dwelling, the hurried assembling of the neighbors; the discovery of the freshly made tracks; the hot pursuit on the recent trail; the endeavors to elude the pursuers; the frequent recognitions and final capture of defendant with travel stains fresh upon him; his clothing dripping from recent exposure

and rapid flight through the snow, and then his unintentional and virtual admission of knowledge of the crime; all those concomitant circumstances unite in declaring defendant the perpetrator of a cluster of atrocious crimes which never before have found parallel in Missouri.

The judgment is affirmed, and we direct that the sentence of the law be carried into execution. GANTT, P. J., concurs. BURGESS, J., not sitting.