## THE STATE v. J. B. SMITH, Appellant.

### Division Two, November 24, 1908.

1. **HOMICIDE: Defense of Property: Trespasser: Instruction.** Where there is no room under defendant's evidence for the application of the doctrine that defendant shot and killed deceased in the defense of his property rights, and their relative legal rights to the lot where the killing occurred are not an issue before the jury, and shed no light upon the solution of the question as to what actually occurred at the immediate time of the killing, it is not error to refuse an instruction for defendant to the effect that defendant had the right to use the lot and to repair the gate and was not a trespasser, and deceased had no right to drive him away, and if he attempted to do so defendant had the right to refuse to go, and if necessary to resist any force, etc. Where defendant's defense is that he shot deceased in the exercise of the right of self-defense against an illegal assault on his person, it would be to inject into the case a question foreign to the issues to instruct the jury that defendant had the right to shoot deceased in defense of his property.

2. **JUROR: Formed and Expressed Opinion.** Where a witness testified that prior to the trial a juror was at her house and said as he started away that he was going to help hang defendant, and another witness testified that he had a conversation with the juror prior to the trial and told him the facts of the case as he understood them and that the juror expressed the opinion that defendant ought to be convicted, and the juror positively denied both statements, and the matter was heard by the trial court and this ground for a new trial overruled, this court will not hold that there was any such abuse of judicial discretion as authorizes a reversal of the judgment.

Appeal from Shannon Circuit Court.—*Hon. W. N. Evans*, Judge.

AFFIRMED.

*James Orchard, S. A. Cunningham, J. B. Searcy* and *L. M. Searcy* for appellant.

(1) Under the testimony in this case it is undisputed that defendant reserved the right to pass

through the lot at deceased's house in going to and from the field to his corn that he was cultivating. He also reserved the right to use the barn or stables in said lot. That being so, the court should have given the instruction. Under the reservation the lot became his home and premises, which he had the right to go on to repair and do such things as were necessary, without being molested. State v. Pollard, 139 Mo. 220; State v. Kennade, 121 Mo. 405. (2) Defendant was protecting his own property at the time he shot and killed Blackburn. He had gone to the place where the killing was done to repair a gate that was down, or had been down, and which led into his crop, where he had a right to be. Blackburn approached him in a threatening manner and defendant shot and killed him. Under the facts in the case he was only guilty of manslaughter in the fourth degree. State v. Mathews, 98 Mo. 119. (3) The court erred in not granting a new trial, for the reason that U. B. Summers had formed and expressed an opinion before he was qualified on the jury.

*Herbert S. Hadley,* Attorney-General, and *F. G. Ferris* and *N. T. Gentry,* Assistant Attorneys-General, for the State.

(1) The general doctrine as to the defense of one's castle is not applicable as to the defense of rights of property, such as defendant claimed to have in this case. 67 L. R. A. 538, note C. Defendant admitted the killing and justified it upon the ground of self-defense. Self-defense was the issue of fact in the case. People v. Conkling, 111 Cal. 621. The instruction on self-defense, given by the court, fully set forth the law of self-defense and clearly accorded to defendant all the rights he would have possessed on premises not in the possession of the deceased; hence, defendant was not prejudiced by the refusal of the court

to give the said instruction asked. Furthermore, the said instruction given in no manner limited defendant's right of self-defense by reason of the fact that the homicide occurred upon premises occupied by the deceased. It even told the jury that defendant "had a right to stand his ground" in his self-defense. The said instruction given was sufficient, and an instruction on defendant's right to use the lot was unnecessary and improper under the evidence. State v. Zorn, 202 Mo. 43; State v. Hargraves, 188 Mo. 351; People v. Conkling, 111 Cal. 616; Com. v. Bullock, 67 S. W. 992. (2) Defendant contends that he was protecting his own property, and that Blackburn was approaching him in a threatening manner at the time he killed Blackburn; and that, therefore, defendant was guilty only of manslaughter in the fourth degree. By contending that defendant was guilty of manslaughter in the fourth degree, but of no other offense, defendant takes the position that while defendant was not excusable or justifiable in shooting Blackburn, yet Blackburn's acts, in respect to defendant's property, and in respect to defendant in connection therewith, were such as to engender in defendant that hot blood and passion which temporarily dethroned his reason and mitigated his offense to the low grade of manslaughter in the fourth degree. There was no evidence in the case tending to prove that defendant was protecting his own property at the time of the homicide, or that deceased gave defendant reasonable provocation by forcible trespass upon defendant's property, either actual or threatened. The evidence abundantly supported the verdict of murder in the second degree. (3) In the motion to set aside the verdict and grant a new trial, it is alleged that one of the jurors, U. B. Summers, had expressed opinions adverse to defendant before qualifying as a juror. When there is evidence pro and con in a case of this sort, it would re-

quire a strong case, one showing a flagrant abuse of discretion on the part of the trial judge, to warrant the Supreme Court in interfering and setting aside a verdict. State v. Gordon, 191 Mo. 133; State v. Cushenberry, 157 Mo. 168; State v. Cook, 87 Mo. 40; State v. Howell, 117 Mo. 342; State v. Soper, 148 Mo. 217.

GANTT. J.—This is a prosecution commenced on the 24th day of September, 1905, by the prosecuting attorney of Shannon county, before a justice of the peace, charging the defendant with having feloniously, willfully, deliberately, premeditatedly and with malice aforethought shot and killed John W. Blackburn at said county on the 24th day of September, 1905.

A warrant issued and the defendant was duly arrested. The preliminary trial was set for October 2, 1905, and on that day the defendant waived examination and was admitted to bail in the sum of five thousand dollars to appear at the regular March term, 1906, of the circuit court of said county. The case was continued at the March term to the September term, 1906, and at the September term, 1906, the prosecuting attorney filed an amended information charging the defendant with murder in the first degree in the killing of said Blackburn. As the information is in all respects sufficient under repeated adjudications of this court, it is unnecessary to set it forth at length. At the same term of the court, the prosecuting attorney elected to prosecute for murder in the second degree, and thereupon the defendant was duly arraigned and entered his plea of not guilty and the trial was had before a jury, who returned a verdict of guilty of murder in the second degree and assessed the defendant's punishment at eighteen years' imprisonment in the penitentiary. Within four days thereafter the defendant filed his motion for new trial, which was overruled

by the court, and the defendant saved his exceptions. In due time the defendant prayed and was granted an appeal to the Supreme Court.      At the October term, 1907, of this court, it appeared that the circuit court had failed to enter a judgment and sentence and thereupon, upon the application of the Attorney-General, the record was remitted to the circuit court to cause the defendant to be brought before it and sentenced in accordance with the verdict of the jury. And it appears from the record now before us that on the 12th day of March, 1908, the circuit court duly passed sentence upon the defendant in accordance with the verdict and on the same day an appeal was granted to this court from the judgment and sentence.

The testimony on the part of the State tends to show that on September 24, 1905, the defendant and the deceased, Blackburn, were each cultivating land on the farm of Mrs. Elizabeth Chilton in Shannon county.      It would seem that the defendant had leased the land from Mrs. Chilton and afterwards rented the land which the deceased Blackburn occupied to the said Blackburn, and moved out of one of the houses on the premises and gave Blackburn the right to occupy the house and land which he was to cultivate. On the premises rented to the deceased, there was a horse lot, a barn or stable, which was used in connection with the house that the deceased occupied. This horse lot was from twenty-five to fifty yards from the house which the deceased occupied.      There was a passageway or wagon road through this horse lot, one gate leading from the public road into the lot, and another leading out on the other side of the lot into the field, in which both the defendant Smith and the deceased Blackburn had their crops planted.      There was evidence on the part of the defendant that when he rented to the deceased, defendant reserved the right

to go through the lot to his crop and the right to occasionally use the stable.

Mrs. Laura Bell, who was the wife of the deceased Blackburn at the time he was killed, but prior to the giving of her testimony in this case had become the wife of one Bell, testified that she and her husband, the deceased, on the day of the killing, had been on a visit to a neighbor's house, and as they approached their home on the said rented premises the deceased Blackburn went on ahead of her, and turned up a road that went to the barn. The defendant Smith and one John Ipock were in the barn lot; as the deceased approached the fence near where the defendant stood, deceased put down a kettle he was carrying in his hand, and defendant threw a hammer at him, and started back. Defendant then drew a revolver from his pocket and shot at Blackburn, whereupon Blackburn said, "Don't shoot me, Joe, don't shoot," and turned and got over the fence just below the gate from the defendant. Thereupon the deceased started and was about half stooped over when the defendant fired two shots and Blackburn fell dead.

A daughter of the deceased, Bertha Blackburn, about fifteen years old, testified that her father was killed on Sunday. That while her parents were visiting a neighbor, the defendant Smith and John Ipock came to her father's home to nail up a fence or fix a gate. Witness had been getting out pine knots to start a fire and saw her father and mother coming up the road. She saw her father turn towards the defendant and she called to him, as she said she had an idea they were going to have a quarrel. Her father dropped his kettle by his side and said to defendant, "Smith who ordered you on my premises?" and defendant said he ordered himself. Thereupon her father, the deceased, told him that if he had any business down the road he had better be going. When

defendant fired the first time, the deceased was on
the outside of the fence, but then jumped over the fence
and as he did so defendant's pistol snapped at him.
Thereupon the deceased said, "Joe, don't shoot me."

John Ipock testified that he was at the defendant's
farm with the defendant on Sunday, the day Black-
burn was killed.    He and the defendant passed the
house in which Blackburn lived and saw a calf in
Smith's corn, and they later returned there with tools
and a plank to fix a gate.    As they were finishing the
repairs on the gate the deceased approached, and af-
ter saluting Ipock, said to the defendant, "Joe, who
gave you orders to come on my premises?"    Defend-
ant replied, "By G— D— I took it."    Deceased then
said, "If you have any business you had better be go-
ing."    Deceased then reached down towards the
ground, but witness did not know whether he was set-
ting the vessel down or not.    Deceased then stepped
closer and as he did so defendant threw the hammer
at him, deceased falling back on the ground and the
defendant getting back of the gate, which swung east.
When defendant came back he had his pistol in his
hand and Blackburn said, "Joe, don't shoot," and the
witness said:    "No, I do not want to see any of that
while I am here."    The defendant thereupon said to
the deceased, "Now beg.    You went on the straw stack
and watched for me."    Deceased replied:    "Joe, that
is a lie, I never."    Defendant then shot, but seemed
to miss Blackburn, who got over the fence and started;
at the same time defendant snapped his pistol, and
then fired the fatal shot.    This witness did not see
the deceased have any rock or weapon in his hand.
The testimony further developed that the deceased
fell with his head about twelve feet from the post at
which the gate opened.    The ball which inflicted the
fatal wound entered the temple of the deceased, passed
nearly straight through according to one witness, and

according to two other witnesses ranged downward as though the deceased was in a stooping position when he was shot.

On the part of the defendant the evidence tended to prove that the crops which had been planted by the deceased and the defendant on this farm had been laid by, and there was evidence tending to show that the deceased had left the fence down two or three times between the lot and Smith's crop of corn. On the day of the shooting, as the defendant Smith and Ipock passed the residence of the deceased in order to go to the defendant's home, they saw the lot gate leading from the lot into the field where Smith's crop was, down, and a calf was in the corn, and the defendant called to deceased's children asking where their father was, and they told him that he and their mother were on a visit to one Donohue. Thereupon the defendant told them to tell their father that the calf was in the corn and that the hogs had been in there eating up the down corn, and to tell their father to keep them out. When the defendant reached home that day he requested Ipock to go back up there with him and assist him in putting up the gate. He took a plank and saw and a hammer to repair the gate. When they arrived there the gate had been set up, but the top hinge had been broken off. The defendant went to work to repair the gate and finished it up. About the time he was through repairing the gate, the deceased came from the south to where they were at the gate. After having spoken to the defendant as above narrated and having told him that if he had any business down the road he had better be going, according to the defendant's testimony, the deceased then sat down the bucket or kettle which he had in his hand, and picked up a rock, and as he raised up from the ground, drew his right hand back as if he were going to throw; that thereupon the defendant threw the hammer at him

and missed him; that the deceased then jumped inside of the fence to the side where the defendant was; defendant then says he retreated behind the gate, pulled his pistol and fired and then snapped it, and deceased then said, "Don't shoot me, Joe," and defendant then says he lowered his pistol and made no attempt to shoot and about that time the deceased got over the fence and made an effort to go around the gate and drew his hand back as if he was going to throw, as defendant thought, a rock. And then defendant shot again and inflicted the wound which killed the deceased. There was also evidence of threats against the defendant on the part of the deceased, some of which had not been communicated.

In rebuttal Mrs. Blackburn testified that her husband had no weapon of any kind at the time he was killed, and at no time during the difficulty raised his arm in a position to throw. Bertha Blackburn testified that at no time during the affair did she see that her father had any weapon or rock and he did not throw or make any other demonstration.

The court in its instructions defined murder in the second degree and the meaning of the words, "willfully, premeditatedly, malice and malice aforethought" as they have often been defined with the approval of this court, and no exception is taken to the action of the court in this respect and we discover no ground for complaint in that respect.

The court also instructed on the presumption of innocence, and reasonable doubt, and on the right of self-defense. Also instructed the jury that they might take into consideration any threats the deceased had made against the defendant as affecting the right of the defendant to act on less appearance of danger than if such threats had not been made and communicated. The court also instructed the jury on man-

slaughter in the fourth degree.    The defendant requested the court to instruct the jury as follows:

"The court instructs the jury that under the evidence in this case, the defendant had the right to use the lot in question and had the  right to repair the gate and was not a trespasser and the deceased had no right to drive him away, and if he attempted to do so, defendant had the right to refuse to go and if necessary to resist any force that might be used to expel him from the premises, even to the taking of the life of the deceased if it became necessary." Which instruction the court refused and the defendant assigns this action of the court as error.

I.    The principal contention is that the circuit court refused the instruction requested by defendant.

We do not desire to base our ruling upon the ground that the defendant's own testimony only authorized him to use the lot as a passway and made no mention of a duty upon his part to repair the  gate. It is perfectly obvious to us that the rights of defendant and deceased must be adjudged upon the facts in evidence just prior to and at the time of the homicide. As said in People v. Conkling, 111 Cal. l. c. 621, "The relative legal rights of the parties as to the road were not an issue before the jury, for they shed no light upon the solution of the question as to what actually occurred at the immediate time of the killing."    So we say in this case, under the defendant's own evidence there is no room for the application of the doctrine that he shot and killed the deceased in the defense of his property rights.    According to his testimony he shot and killed the deceased in the exercise of a right of self-defense, the defense of his own person against the illegal assault on the part of the deceased.    His testimony tended to prove this defense, and the court gave him a full and ample instruction on the right of self-defense.    His evidence tended to show that the

deceased without legal provocation had stooped and picked up a rock and either threw it at him or was in the act of throwing it at him when he shot and killed him.      The court in view of this testimony not only instructed on the law of self-defense but instructed for manslaughter in the fourth degree, and an instruction such as requested by the defendant in this case would have been an invitation to the jury to have considered a matter entirely foreign to the real issue before them.

Counsel have called our attention to the cases of State v. Kennade, 121 Mo. 405, and State v. Pollard, 139 Mo. 220.    Those cases announce the familiar doctrine that the owner of a house and in the possession thereof has a right to protect it and himself in it against all unlawful trespassers against him.    But those cases have no application to the facts of this case.    This record discloses that the circuit court gave the defendant the full benefit of an instruction on the law of self-defense and in no manner limited his right of self-defense by reason of the fact that the homicide occurred on the premises of the deceased.    As was said in State v. Hargraves, 188 Mo. l. c. 350, ''It clearly appears from the testimony [of the defendant] that the assault made by the defendant upon the deceased was in repelling or resisting an assault made by the deceased upon him.    The facts in this case do not present that character of struggle where the assault is made in protection or defense of his home or premises, nor in an effort to eject a trespasser from the premises of another, in which the party would have the right to use all the necessary force to accomplish his purpose.''    We think the court correctly refused to give this instruction, especially as it had fully covered all the issues of law arising upon the evidence in the case.    And these observations apply with equal force to the second contention of the defendant in his brief, that in killing Blackburn under the circum-

stances, he was only guilty of manslaughter in the fourth degree. His own evidence, as well as all of the other evidence, refutes the theory that he was acting in defense of property. State v. Matthews, 148 Mo. 185, relied upon by the defendant, was wholly unlike in its facts to the case now under review.

II.   It is insisted that the court erred in not granting a new trial for the reason that U. B. Summers had formed and expressed an opinion before he was qualified on the jury.   In support of this ground the defendant filed the affidavit of Lucinda Burris to the effect that the juror, Summers, was at her residence on Sunday, the 9th of September, 1906, and that as he started off said he was going to help hang Joe Smith. One Honeycutt testified that he had a conversation with Summers and told him the facts of the case as he understood them and that Summers expressed the opinion that the defendant ought to be convicted.   On the other hand, the juror was called as a witness and was examined fully as to both of his alleged statements and denied positively both of the statements and the matter was heard by the trial court and this ground for new trial was overruled.   We have often held that where there is evidence pro and con in a case of this sort, the evidence should be such as to show a clear abuse of discretion on the part of the trial judge in order to warrant this court in interfering and setting aside a verdict.   [State v. Gordon, 191 Mo. 133; State v. Howell, 117 Mo. 342; State v. Cook, 84 Mo. 40.]

Upon a review of the whole record, it appears to us that there was ample evidence to justify the verdict of the jury, and we have been unable to discover any reversible error in the record, and accordingly the judgment is affirmed.

*Fox, P. J.,* and *Burgess, J.,* concur.